

U.S. Department of Justice

United States Attorney
Eastern District of New York

NB:JMM/LTG
F. #2014R01885

610 Federal Plaza
Central Islip, New York 11722

December 9, 2015

By ECF
Hon. Leonard D. Wexler
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

        Re:    United States v. James Burke
                  Criminal Docket No. 15-627 (LDW)

Dear Judge Wexler:

        The government submits this letter in support of our application for the pretrial detention of the defendant James Burke, who is charged in the indictment captioned above with both a crime of violence and obstruction of a federal investigation, as there is a serious risk that the defendant poses a danger to the community for which "no condition or combination of conditions will reasonably assure the safety of [] other persons and the community…." 18 U.S.C. § 3142(f)(2)(B).

        I.       Facts Supporting a Finding of Dangerousness and Detention of Burke

        As the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., and the Second Circuit have provided, the government may present evidence in support of detention by way of proffer. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); United States v. Ferranti, 66 F.3d 540, 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same). The facts below summarize the grounds for the requested relief. The government also respectfully requests the opportunity to orally supplement the argument at the arraignment scheduled for 2:00 p.m. today.

        A.       The Defendant's Crime of Violence

        On the morning of December 14, 2012, New York State Probation Department and Suffolk County Police Department (SCPD) officers arrested probationer Christopher Loeb at his mother's home in Smithtown, New York. Officers discovered a cache of property stolen from numerous automobiles, among them an SCPD-issued SUV operated by

the defendant Burke, who was at the time the SCPD Chief of Department—the highest-ranking uniformed officer in the department. The items stolen from Burke's vehicle included his gun belt, magazines of ammunition, a box of cigars, humidor, and a canvas bag that contained, among other items, sex toys and adult video pornography. Loeb was taken to a local precinct for arrest processing.

Later that day, Burke abused his rank by walking into the interrogation room where Loeb was handcuffed, hunched over and manacled to the floor, and assaulted Loeb. Burke shook Loeb's head violently, punched him in the head and body and attempted to knee and kick Loeb. Also, knowing that Loeb was a heroin addict, Burke threatened to kill Loeb, stating he would make sure Loeb received a "hot shot." A "hotshot" is slang for either a fatally strong dose of heroin or one mixed with chemicals or poison intended to kill upon injection.

Though unable to defend himself, Loeb, referencing the pornography he found in Burke's canvas bag (which he mistakenly believed depicted a minor on a printed cover) called Burke "a pervert." Burke then went out of control, screaming and cursing at Loeb and assaulting him until a detective finally said, "Boss that's enough, that's enough."

      B.     <u>Burke's Use of Power to Corrupt Departmental Personnel and Process</u>

In addition to abusing his authority by assaulting Loeb at the precinct, earlier on December 14, 2012, Burke abused his authority by entering the Loeb residence, a crime scene, even as the police search for evidence was still underway. Burke retrieved his canvas bag and other articles in direct violation of police procedure and protocol. In other words, Burke tampered with and removed evidence from a crime scene because he was the "Chief" and because he knew no one would stop him.

Later that day, Burke congratulated officers (apparently unconcerned that he had jeopardized a larceny investigation that victimized many other civilians, solely to retrieve embarrassing articles) and even bragged to others within the SCPD about his assault of Loeb. Days later, at a department event, Burke regaled a group of officers with his account of the assault, saying it reminded him of his "old days" as a young police officer, and referred to detectives who were present during the assault of a defenseless prisoner as his "palace guards."

      C.     <u>Burke's History of Abuse of Power Within the<br>Department and Has Long Created a Climate of Fear</u>

As set forth more fully below, Burke engaged in, and is now charged with, conspiring to obstruct a Federal investigation using subordinates within the SCPD and non-law enforcement allies to cover-up his crimes. However, it is critical to underscore that his obstruction in this matter is merely one event in what witnesses have described as a long-standing series of events orchestrated by Burke with the intent to create a climate of fear to protect his interests.

2

For instance, in 2011, Burke, by his own admission to others, was driving under the influence of alcohol and struck a state-owned vehicle. Abusing his power and authority, Burke and the other driver left the scene of the accident, avoiding prosecution for the DUI, and committing a further crime by leaving without reporting the accident. The extensive damage to the state vehicle that he struck, and his other criminal conduct, was concealed by Burke, who paid thousands of dollars out-of-pocket for vehicle repairs to cover-up his crimes.

Interviews of multiple SCPD personnel reveal that they regularly performed personal favors for Burke while on duty. Moreover, in 2013, Burke ordered the illegal installation of a GPS device on a high-ranking civilian police department official. The purpose of the GPS was to conduct surveillance of the official, whom Burke disliked, in an attempt to gain information that would enable him to blackmail or force that official out of office.

Finally, Burke regularly discussed his desire to seek retribution against a list of current and former SCPD personnel who he viewed as disloyal, and recruited and ordered others to assist him in these endeavors.

This Court should consider all of this uncharged conduct in assessing the degree of danger posed by the defendant's release. United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991); United States v. Barone, 387 Fed.Appx. 88, 90 (2d Cir. 2010) (affirming detention order based, in part, on uncharged crimes).

D. Burke's Intimidation of Witnesses and Obstruction Conspiracy

In December 2012, Loeb was indicted by the Suffolk District Attorney's Office on 30 counts related to the break-ins of numerous automobiles, including Burke's. On or about March 15, 2013, a Queens Assistant District Attorney was appointed to act as special prosecutor in the Loeb matter.

As Loeb's allegations of the assault became public through the filing of a suppression motion, SCPD personnel who witnessed the assault came under direct and extreme pressure from Burke to conceal it. Shortly after the appointment of the special prosecutor, Burke summoned the witnesses to his office at SCPD headquarters in Yaphank, New York, for the purpose of getting their "stories straight." Burke told the witnesses that they should agree that he merely "popped" his head in to look at Loeb at the precinct, but that otherwise, nothing happened. Knowing Burke's reputation for violating the law and seeking retribution against those who went against his corrupt orders, the witnesses feared their careers would be destroyed if they did not join Burke's conspiracy to cover up the assault of Loeb.

In May 2013, the Civil Rights Section of the United States Attorney's Office for the Eastern District of New York and FBI opened an investigation of the Loeb incident.

3

Numerous department witnesses, including those who bore no criminal liability, were ordered by Burke, through the chain of command, to meet federal agents or prosecutors with lawyers appointed by the union.  Other personnel were "assured" that the federal investigation was a mere "fishing expedition," but were also warned that attorney fees would be paid by the union only as long as they did not admit to any wrongdoing.

One member of the SCPD, who merely overheard a reference to the pornography found in Burke's canvas bag, was pressured to change that account and urged to "re-think" that the pornography belonged to Loeb.  Further, a police union official has admitted that he told several SCPD personnel that superiors, including Burke, had secretly obtained copies of FBI memoranda of interviews with witnesses in the federal investigation, and ominously suggested it would soon be known who was "talking" to federal law enforcement.  That same union official then said that the claimed acquisition of FBI reports was false.  Nevertheless, witnesses were terrified upon hearing the claim that Burke and others had access to federal investigative materials.  Upon hearing the claim, one SCPD witness told a federal agent that if the claim were true, "I'm a dead man."

In October 2013, an evidentiary hearing on Loeb's motion to suppress evidence in his state case was held in New York Criminal Court in Riverhead, New York. One of the SCPD officers identified as present during the assault was subpoenaed to testify. Days before the hearing, Burke confronted the witness and reiterated his expectation that the witness falsely deny Loeb's allegations.  With no recourse, and fearing retribution if he testified truthfully or even asserted his Fifth Amendment privilege against self-incrimination, the eyewitness committed perjury at Burke's direction at the hearing and falsely denied that Loeb had been assaulted.

Efforts by Burke to tamper with witnesses and impede the federal investigation have continued to the present, and Burke's touted connections to law enforcement who remain on duty in the county continue to instill fear.  In 2014, SCPD officers assigned to a joint state-federal task force on Long Island were ordered by Burke to report back to him in the event they observed certain witnesses meeting with federal agents or prosecutors at FBI offices or the United States Courthouse in Central Islip.  Several witnesses have advised that as late as October 2015, Burke handed, or attempted to hand witnesses a "timeline" of the Loeb matter containing a litany of false events and suggested talking points to argue that any continuing investigation of him was improper.  Consistent with witness accounts of meetings with Burke, the timeline includes Burke's false claim that on December 14, 2013, he merely "popped" his head into the interrogation room where Loeb was in custody to see if he recognized the suspect.  Finally, in consultation with law enforcement officials, Burke ordered a commanding officer within the SCPD to find out if any of the eye-witnesses to the assault were cooperating with federal authorities, and to remind them of the potential for retribution should they cooperate.  While Burke has now retired from the SCPD, he continues to maintain strong personal relationships with high-ranking members of law enforcement.

II.     Legal Analysis

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., this Court is empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). Flight-risk exists in this case but can be mitigated through the posting of significant collateral to secure a bond and other conditions. Such conditions should be imposed in the event that the Court does not detain the defendant. However, it is the evidence that the defendant has obstructed a federal investigation, and would be in a position to continue to do so if released that prompts this motion for detention on the grounds that he poses a danger to the community. A finding of dangerousness must be supported by clear and convincing evidence. Ferranti, 66 F.3d at 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

The Bail Reform Act lists the following four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings; Ferranti, 66 F.3d at 542 (same) United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 (2d Cir. 2004).

The Second Circuit has repeatedly stated that even elaborate conditions of home detention cannot substitute for incarceration where the defendant is violent or cannot be trusted to comply with the conditions of release. In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (citation and internal quotation marks omitted). See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted); see also United States v. Tortora, 922 F.2d 880, 886-87 (1st Cir. 1990) (elaborate conditions dependent upon good faith compliance were insufficient where the defendant's violent history provided no basis for believing that good faith would be forthcoming).

Finally, it is the law in this Circuit that a finding of dangerousness may exist even in the absence of violence or threatened violence against prospective witnesses. LaFontaine, at 134. Further, the district court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release. United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991) (reversing release and ordering detention while rejecting "requirement that the violent conduct ... be connected to the activity charged in the indictment"); United States v. Barone, 387 Fed.Appx. 88, 90 (2d Cir. 2010) (affirming detention order based, in part, on uncharged crimes).

III.     Burke Constitutes a Danger to the
         Community and Should Be Detained

Under the Bail Reform Act, the factors to be considered by the Court on an application for detention by the government are (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant and (4) the "nature and seriousness of the danger to any person of the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g). Applied to this case, all four factors call for Burke's detention.

   A.     Nature and Circumstances of the Offenses Charged

The charges against the defendant go to the heart of the Bail Reform Act's concerns for safety of the community. Abusing one of the most powerful law enforcement positions in Suffolk County, the defendant violated the civil rights of an individual by assaulting and threatening to kill that person, under color of law. It was an act of violent retribution that Burke was able to commit and then conceal through his use of official power and intimidation. The arrest and prosecution of Loeb should have been a routine matter. The defendant made it anything but.

6

Not only did Burke use violence against a man who was manacled and completely unable to protect himself against the assault, he then used his position within the police department to subvert the criminal justice system to obstruct a federal investigation. He pressured those under his command to lie and conceal the assault, and used others still in law enforcement to intimidate witnesses. As noted above, his power within the county has caused numerous witnesses to admit their fear that Burke, directly or through remaining allies, possesses the ability to destroy careers or worse. That a veteran law enforcement officer--since forced out of the department--would declare, "I'm a dead man," upon being told that Burke had supposedly gotten access to federal investigative materials, is testament to the danger this defendant poses. That Burke was able to suborn perjury to thwart a federal investigation, and continued as late as October to try to intimidate witnesses to agree upon a false "timeline" of events, shows that the danger continues and is unlikely to be relieved by the posting of collateral for bail while awaiting trial.

      B.      The Weight of the Evidence Against Burke

The federal investigation against Burke is over two and a half years old. Dozens of witnesses have been either interviewed and/or have testified before a federal grand jury. Eyewitnesses unanimously identify Burke as having assaulted and injuring Loeb on December 14, 2012. The event is corroborated by photographic identification, and further corroborated by other evidence. Similarly Burke's intimidation of witnesses and use of the power of his office and allies within law enforcement to pressure others has been repeatedly testified about, and corroborated by records and other evidence.

      C.      The History and Characteristics of the Defendant

Actions taken by Burke during his tenure in law enforcement highlight the fear he is able to instill in others and support this motion for detention. As noted above, those actions have continued to the present, and include ordering detectives assigned to a federal-state task force to "spy" on federal law enforcement colleagues for information about this very investigation.

      D.      The Nature and Seriousness of the Danger Posed to the
              Community if Burke Were Released

If convicted at trial, the defendant faces an estimated Sentencing Guidelines range of between 63 and 78 months' imprisonment. The statutory maximum on Count One is 5 years and the statutory maximum on Count Two is 20 years.

Finally, witnesses have told the government that during the past several months, Burke suspected he would be indicted, and threatened to "take everyone" down with him. Alternatively, he pleaded with others to remain "strong" and not cooperate with federal authorities. During these conversations, Burke has also alluded to private matters affecting the personal lives of SCPD personnel and their families in clear efforts to blackmail them into submission. His long association with some law enforcement officials insures his

ability to continue to intimidate witnesses while awaiting trial, a danger that cannot be mitigated by typical bail conditions that would merely insure his return to court.  In sum, Burke poses a very serious danger to the community and should be detained.

   Thank you for your consideration of this request.

               Respectfully submitted,

               ROBERT L. CAPERS
               United States Attorney

         By:     /s/
             James M. Miskiewicz
             Lara Treinis Gatz
             Assistant U.S. Attorneys
             (631) 715-7841/7913

cc:  Joseph R. Conway, Esq.
    Nancy Bartling, Esq.