UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA,

                                    15-CR-627 (LDW)

          v.


JAMES BURKE,

               Defendant.

--------------------------------------------------X


**<u>SENTENCING MEMORANDUM ON BEHALF OF JAMES BURKE</u>**


John Meringolo, Esq.
Meringolo & Associates, P.C.
375 Greenwich Street
New York, NY 10013
*Attorney for James Burke*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………ii

INTRODUCTION……………………………………………………………………………..1

I.      BACKGROUND AND PERSONAL HISTORY
        OF JAMES BURKE………………………………………………………….…...1

A.      Early Years & Family Life……………………………………………………….2

B.      Law Enforcement Career…………………………………………………………5

C.      Accolades & Commendations………………………………………………...…12

II.     PROCEDURAL BACKGROUND AND
        GUIDELINES CALCULATION……………………………………………………18

III.    LEGAL AUTHORITY IN SUPPORT
        OF A NON-GUIDELINES SENTENCE………………………………………..20

IV.     A NON-GUIDELINES, NON-INCARCERATION SENTENCE IS
        SUFFICIENT, BUT NOT GREATER THAN NECESSARY,
        TO SATISFY THE SENTENCING GOALS OF 18 U.S.C. § 3553(a)…………22

A.      Probation Is Punishment and A Sentence of Probation Would Satisfy the Four
        Goals of Sentencing……………………………………………………………....23

B.      A Probationary Sentence Would Avoid Unwarranted
        Sentencing Disparities……………………………………………………....…27

C.      Consideration of Mr. Burke's Family Circumstances is Warranted…………….31

V.      ADDITIONAL INFORMATION FROM FAMILY AND FRIENDS…………..34

CONCLUSION……………………………………………………………………………..39

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*United States v. Bakhtiari*, 714 F.3d 1057, 1062 (8th Cir. 2013) ...................................... 19

*United States v. Booker*, 543 U.S. 220 (2005). ...................................................... 21

*U.S. v. Cari*, 631 Fed.Appx. 5 (2d Cir. 2015) ........................................................ 26

*United States v. Cavera*, 550 F.3d 180, 189-190 (2d Cir. 2008) .............................. 20

*U.S. v. Cossette,* 593 Fed.Appx. 28 (2d. Cir. 2014). ............................................. 26

*United States v. Crosby*, 397 F.3d 103, 111-12 (2d Cir. 2005) .............................. 20

*United States v. Faria*, 161 F.3d 761, 762 (2d Cir.1998) ..................................... 28

*United States v. Frazier*, 2013 WL 499245, at *8 (D.N.M. 2013)...........................30

*United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) ..................................... 28

*United States v. Gall*, 128 S. Ct. 586 (2007).................................................... 21

*U.S. v. Gray, et al.,* 421 Fed.Appx. 11 (2d. Cir. 2011) ........................................ 26

*United States v. Gray*, 692 F.3d 514, 519 (6th Cir. 2012)...................................30

*United States v. Greene*, 249 F. Supp. 2d 262, 266 (S.D.N.Y. 2003)............................28

*United States v. Harris*, 408 F.3d 186, 187 (5th Cir. 2005)…………………………………30

*United States v. Ingram*, 721 F.3d 35, 38 (2d Cir. 2013)...................................... 21

*United States v. Jones*, 531 F.3d 163, 173 (2d Cir. 2008) ................................... 21

*United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) ............................... 28

*Kimbrough v. United States*, 552 U.S. 85, 96 (2007) .......................................... 21

*United States v. LeMoure*, 474 F.3d 37, 46 (1st Cir. 2007)……………………………………30

*U.S. v. Livoti*, 196 F.3d 322 (2d. Cir. 1999)........................................................ 27

*United States v. Monaco*, 23 F.3d 793, 801 (3d Cir. 1994). ................................. 27

*Nelson v. United States*, 129 S. Ct. 890 (2009)................................................... 21

*United States v. Nesbeth*, 2016 WL 3022073, at *1 (E.D.N.Y. 2016)……………………23

*U.S. v. Spaulding,* 631 Fed.Appx. 5 (2d Cir. 2015) ............................................. 26

*United States v. Sprei,* 145 F.3d 528, 535 (2d Cir. 1998) .................................... 28

*United States v. Jensen*, 248 F. App'x 849, 851 (10th Cir. 2007)............................ 18

*United States v. Petruk*, 2016 WL 4709118, at *1 (8th Cir. Sept. 9, 2016)..................... 19

*United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) .................................. 20

*Rita v. United States*, 551 U.S. 338, 349-350 (2007)........................................... 21

*United States v. Roberts*, 2005 WL 1153757 at *5 (S.D.N.Y. 2005) ........................... 28

*United States v. Rodriguez,* 499 Fed.Appx. 904, 909 (11th Cir. 2012) ....................... 19

*United States v. Cozzi*, 613 F.3d 725, 734 (7th Cir. 2010)………………………………………30

*U.S. v. Walsh,* 194 F.3d 37 (1999)....................................................................... 27

*United States v. Wilson*, 344 F. App'x 134, 138 (6th Cir. 2009)………………………………30

### <u>Statutes</u>

18 U.S.C. § 1512(c)(2)………………………………………………………………………………1,17

18 U.S.C. §1512(k) ........................................................................................... 1, 17

18 U.S.C. § 242 ............................................................................................... 1, 16

18 U.S.C. § 3553(a) .................................................................... 1, 20, 22, 25

18 U.S.C. § 3553(a)(2)..................................................................................... 20

**Sentencing Guidelines**

U.S.S.G § 5B1.3 ...........................................................................................23
U.S.S.G. § 2J1.2(b)(3)(C)...................................................................... 17, 19
U.S.S.G. § 3A1.3 ........................................................................................17
U.S.S.G. § 3B1.3 ........................................................................................17
U.S.S.G. § 3C1.1 ........................................................................................17
U.S.S.G. § 2H1.1(b)(1)...............................................................................17
U.S.S.G. § 2J1.2(a) .....................................................................................17
U.S.S.G. § 2J1.2(b)(2) ................................................................................17
U.S.S.G. § 2J1.2(b)(3)(C)...........................................................................18
U.S.S.G. § 3B1.1(a).....................................................................................17
U.S.S.G. § 3B1.1(c).....................................................................................17
U.S.S.G. § 3D1.3(a).....................................................................................18
U.S.S.G. § 3E1.1(a)......................................................................................18
U.S.S.G. § 5H1.6 ....................................................................................... 27

**Other Authorities**

Phyllis J. Newton, Jill Glazer & Kevin Blackwell, *Gender, Individuality and the Federal Sentencing Guidelines*, 8 Fed. Sent'g Rep. 148 (1995)........................................................24

Shirley R. Klein, et al., *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002)..................................................................24

U.S. Sent'g Comm'n Staff Discussion Paper, *Sentencing Options Under the Guidelines* (1996) ..............................................................................................................24

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12-13 & Ex. 10 (2004); U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* 8 (2004).....................................................24

**<u>INTRODUCTION</u>**

On November 2, 2016, James Burke (age 52) will appear before this Court to be sentenced for two offenses, deprivation of civil rights, in violation of 18 U.S.C. § 242, and conspiracy to commit obstruction of justice, in violation of 18 U.S.C. §§ 1512(c)(2); 1512(k).

As detailed below, Mr. Burke is a first-time offender with a lustrous 30-year career as a police officer. His offense, while serious, represents much less than the sum of Mr. Burke's character and history. Although Mr. Burke represents a Guidelines sentence of 41 to 51 months' imprisonment, we respectfully ask the Court to impose non-incarceration sentence in consideration of the time Mr. Burke has already served in custody, as well as his extraordinary career history, unique family circumstances, and his genuine acceptance of responsibility.

In the following sections, we set forth (I) relevant information concerning Mr. Burke's background, personal history, and characteristics; (II) a summary of the offense conduct and Guidelines calculations; (III) an overview of relevant legal authority; (IV) information relevant to the factors outlined in 18 U.S.C. § 3553(a); and (V) letters of support from family, friends, and colleagues. In consideration of the information set forth below, we respectfully submit a non-incarceration sentence is warranted.

**I.      BACKGROUND AND PERSONAL HISTORY OF JAMES BURKE**

Mr. Burke has had a long and extraordinary career in public service. He has spent his entire life advocating for others and helping his community. His excellent record is evinced by the countless letters of support that have been submitted on his behalf and the various stories of how Mr. Burke has positively impacted the lives of others. Mr. Burke

has also provided his own letter to the Court, which expresses his sincere remorsefulness for his actions. As Mr. Burke explains:

> It is with great humility and remorse that I write you this letter. I sincerely apologize to [the victim], to my subordinates who I permitted to take part in these offenses, to my colleagues and those who entrusted me who I deceived, to the men and women of the Suffolk County Police Department, to the citizens of Suffolk County and to you, Your Honor, for my actions.
> I have been a police officer for nearly 31 years, 25 of which as a supervisor. I fully believe that one must be accountable for one's actions. I stand accountable for my actions and accept the consequences that result from them. I believe in our system of justice and have every faith and confidence in your fairness and impartiality.[1]

## A.    Early Years & Family Life

James Burke was born and raised in Queens, New York. He is the son of George Burke (age 75) and Frances Locascio Toal (age 75). His father is a retired New York City police officer and registered nurse. Mr. Burke has a brother, Michael (age 50). When Mr. Burke was a child, his parents divorced. Mr. Burke subsequently relocated to Smithtown, Long Island with his mother and stepfather, John Toal. Mr. Burke has a maternal half brother, John Toal (33), NYPD sergeant. Mr. Burke has two paternal half siblings, his sister, Christina Grub (age 32), and his brother, George Burke (age 42), NYPD detective in the Special Investigations Unit. His stepfather passed away in 1998, at age 59, from emphysema and a lung infection. As Mr. Burke's half brother John explains: "It was then that James willingly took on the role of being not only a brother, but also becoming a surrogate father to me. He made certain that I kept up my grades, hung around with the right crowds, and most importantly made sure I was always loved and never felt alone."[2]

---

[1] *See* **Exhibit 1**.
[2] *See* **Exhibit 2.**

2

Mr. Burke describes his childhood fondly and remains close with his family, who has all supported him throughout this case. As his brother George writes: "My brother James is truly a good person and family man who has selflessly protected and helped countless numbers of people in the Suffolk County community throughout his 30 year career."[3]  Mr. Burke has acted as a role model and surrogate father to many, such as his nephew, Thomas James Burke, who writes: "As a child, my Uncle James was thought of as a superhero to my young mind. He was always around, and is like a father figure to me."[4]

Mr. Burke's uncle, Michael J. LoCascio, a Vietnam veteran, awarded the Silver Star, Bronze Star "V", and two Purple Hearts, writes:

> James has always been there for all of his family, willing to lend a hand with everything from advice to making arrangements for medical care for his mother who has suffered with lung cancer for almost 20 years…James was an exceptional police officer for over 30 years. I hope this can be considered in giving him leniency in his sentencing.[5]

Maritza Burke, Mr. Burke's stepmother, writes:

> Though we subsequently divorced, James has always remained a devoted son to me, as well as to his biological parents. Largely due to James' family-oriented nature, and warm, loving demeanor, through my divorce with his father and all, this family has remained extremely close-knit.[6]

Christina Burke Grub, Mr. Burke's sister, writes:

> James has always been my mentor, and a positive role-model in my life. I go to my brother for guidance and advice. James has shown me by example, how to be a strong, hardworking, independent, and how to treat others with respect, kindness and generosity. I have never known someone

---

[3] *See* **Exhibit 3.**
[4] *See* **Exhibit 4.**
[5] *See* **Exhibit 5.**
[6] *See* **Exhibit 6.**

to be more devoted to his family, friends and career, than my brother, James.[7]

Lisa Hill, Mr. Burke's cousin, writes:

Jimmy has always been like my big brother. He has always been here for his family, good and bad times, and has always been a positive role model. His love and dedication to his job and family is and will always be admirable.[8]

Mr. Burke has never been married and does not have any children. Mr. Burke's mother, Frances, and his half brother John, reside with him in his Long Island home. He has devoted his life to taking care of his mother, who was diagnosed with Stage IV lung cancer in 1999. Frances' miraculous longevity is due in no small part to Mr. Burke's efforts. For over a fifteen-year period he was her primary caregiver and is responsible for her day-to-day needs, as she is wheelchair-bound and dependent on an oxygen machine. Recently, she learned that she has a reoccurrence of cancer in her lymph node. As his mother explains, "I do know that James is not in a good position right now…Nevertheless, I need him more than ever as my caregiver, advisor and advocate in the final chapter of my life."[9]

Mr. Burke's incarceration for the last nearly eleven months have been a tremendous hardship on the family, as Mr. Burke's siblings have families and responsibilities of their own and are unable to provide his mother the care that she needs for her survival. As his brother Michael explains: "James also has been the orchestrator in

---

[7] *See* **Exhibit 7.**
[8] *See* **Exhibit 8.**
[9] *See* **Exhibit 9.**

the care of our mother Frances…Without his research and commitment to her health care she would not be alive and I credit him that she is still with us today."[10]

As Katherine Schafer, a lifelong friend of Frances', describes: "Jimmy has been supportive and caring to his mom her entire life, but in particular during her bout with illness. He has always abetted her with home care, doctor's appointments, compassion, etc."[11] Another friend of Frances', Arlene Schein, writes: "He is an extremely devoted son and big brother…The Jimmy I know is always willing to reach out and help when it is needed."[12]

## B.     Law Enforcement Career

Mr. Burke always dreamed of becoming a police officer and has an extraordinarily long history of public service. Shortly after graduating high school, he joined the New York Police Department from January 1985 to July 1986. He then joined the Suffolk County Police Department where he remained for the next thirty years. Mr. Burke's work ethic and talent on the job resulted in rapid advancement. Over the years, Mr. Burke has been promoted or transferred to preferred assignments thirteen times under six different police commissioners. In 1989, he was promoted to undercover investigator in the Suffolk County Police Department narcotics squad, and then in 1991, he was promoted to sergeant, overseeing the officers in the 1st Precinct. In 1995, he was transferred to the 4th Precinct, where he ultimately served as detective sergeant until 1999, when he was promoted to the lieutenant and assigned to the 3rd Precinct. In 2002, Mr. Burke became a detective lieutenant and commanding officer of the Suffolk County

---

[10] *See* **Exhibit 10.**
[11] *See* **Exhibit 11.**
[12] *See* **Exhibit 12.**

District Attorney's Office Detective Squad. In 2003, he was promoted to captain and weeks later, was further promoted to deputy inspector. By 2005, he was promoted to full inspector and commander of the Organized Crime Bureau, overseeing the District Attorney's office and criminal intelligence squad. In 2012, Mr. Burke reached the pinnacle of his career – he became the Chief of Department – where he served until his arrest in the instant matter.

There are many notable achievements in Mr. Burke's career. Some of the accomplishments that he is particularly proud of include him establishing and overseeing the security operation of the Suffolk County Medical Examiner's Office for six weeks in the wake of the TWA Flight 800 tragedy. In 2012, he oversaw all police operations in Suffolk County during the wildfires, blizzard, and Hurricane Sandy that year, saving a number of lives. He also instituted intelligence led policing in the SCPD directing the detection of crime patterns and trends with strategic response targeting prolific, serial criminals.

Mr. Burke's love for his law enforcement career inspires him to teach others. In 1990, Mr. Burke became a certified police instructor. He served in that role in the Suffolk County Police Department with the NYS Division of Criminal Justice Service, and Police Tutorial Services (PTS), a private firm that provides police promotional training. He has positively influenced and enhanced the careers of thousands of police officers. He was named instructor of the year in the SCPD and is renown throughout New York State.

Mr. Burke is well respected and loved by his colleagues, as evinced by the outpouring of support he has received throughout this matter. The following letters

6

represent just a small fraction of the individuals Mr. Burke has positively impacted

throughout his career.

George Burke, police officer and father to Mr. Burke, writes:

I have always said that in 20 years, I never had a day that I really didn't want to go to work and neither did James.[13]

Vietnam veteran and fellow police officer of 37 years, Joseph C. Williams, writes:

A lot of people in Suffolk County, many who he has never met, owe him a debt of gratitude for the police service he has given them all those years.[14]

Edward Fandrey, a member of the Suffolk County Police Department for 37

years, writes:

I have known James to be a smart and hard-working member of the Suffolk County Police Department. He has repeatedly extended himself to help others in need.[15]

Richard T. Tirelli, retired New York City Homicide Detective after serving 31

years, writes:

While a member of the NYPD we many times needed the assistance of other law enforcement agencies, and Suffolk County was one I always received the most help from. That was because of James Burke, who when contacted for assistance on any case or in locating any suspect spearheaded his department to roll out the carpet. James was a wealth of knowledge and a true leader in our field, who was respected by his peers.[16]

Nick Amarr, president of Crime Stoppers of Suffolk County, writes:

As president of Crime Stoppers of Suffolk County, I must declare that former police chief James Burke has been a dedicated supporter of our organization and to the communities of Suffolk County…I can attest to James Burke's professional demeanor with his interactions with my organization for over 12 years![17]

---

[13] *See* **Exhibit 13.**
[14] *See* **Exhibit 14.**
[15] *See* **Exhibit 15.**
[16] *See* **Exhibit 16.**
[17] *See* **Exhibit 17.**

Robert Gardner, a 20-year detective with the New York City Police Department and 11 years with the Suffolk County District Attorney's Office, writes:

> Chief Burke was a professional and competent leader, he always treated the Detectives and Supervisors with respect and appreciation for the job we did. He was always available to meet with, and took every request or recommendation very seriously.[18]

Joseph Brock, retired Suffolk County Police Detective and President of the Suffolk County Retired Police Detectives Association, writes:

> Chief Burke has always shown me his desires to be model police officer with the Suffolk County PD. I have asked Chief Burke on many occasions to speak at my memorial services for fallen police officers. Chief Burke has always demonstrated a compassion for the spouses at the services.[19]

Jack Fitzpatrick, retired from Suffolk County Police Department as the Commanding Officer of the Homicide Squad, writes:

> His efforts to make the Police Department more responsive to crime patterns and trends still realize benefits today.[20]

Kenneth Emanuele, retired Suffolk County police officer and long-time colleague, writes:

> Jimmy was a cop's cop, a loyal and energetic officer, and a hard working man, who rose through the ranks quickly and reached the honorable position of Chief of the Department. I am proud of him and need to let your Honor know, that the man being portrayed in the newspapers, and in media, is not the man I know.[21]

William Grub, a retired New York City Police Department Homicide Detective of the 75th Precinct Squad, writes:

---

[18] *See* **Exhibit 18.**
[19] *See* **Exhibit 19.**
[20] *See* **Exhibit 20.**
[21] *See* **Exhibit 21.**

During his law enforcement years with the NYPD and the SCPD he has come across numerous people that were choosing the wrong road, and with his advice and guidance he helped them turn their lives around. He has volunteered at many different civic groups and organizations in an attempt to improve policing and improve the quality of life.[22]

Michael Cusumano writes:

As a police officer Jimmy was the '10% of the officers' who performed '90% of the work'. He served in a minority area where he treated the community with respect and dignity.[23]

John Rodriguez, a Suffolk County police officer directly supervised by Mr. Burke, writes:

He single handedly transformed the police unit assigned there [DA's office], immediately identifying the workers, both subordinate and supervisory.   He transferred the lazy, and brought in new blood to accomplish the task at hand…Mr. Burke demanded all arrestees, even the violators of the innocent youth or the vulnerable elderly, were to be treated fairly and humanely.[24]

Robert von Schmid, retired from the Suffolk County Police Department after 31 years of service, met Mr. Burke when he was a rookie:

I worked for a lot of chiefs in my time with SCPD and none would go out of their way and have their doors open to the men and women as Jim did. He was THE CHIEF when he had to be and he was a Cop's Cop when you needed help and support.[25]

J. Michael Daly, retired from the Suffolk County District Attorney's Office as a Detective Investigator for 12 years and worked as a federal investigator, writes:

In my 42 years in federal and local law enforcement, I have worked with many law enforcement officials and I consider Jim to be one of the finest of that group. Jim's reputation in the law enforcement community is considered to be devoted, hard-working and knowledgeable.[26]

---

[22] *See* **Exhibit 22.**
[23] *See* **Exhibit 23.**
[24] *See* **Exhibit 24.**
[25] *See* **Exhibit 25.**
[26] *See* **Exhibit 26.**

Timothy O'Flaherty, retired officer from Southampton Town Police Department and former president of Southampton Town Patrolman's Benevolent Association, writes:

> He was very well respected by his coworkers and it was always clear that he wanted to make sure that they were safe and were provided with quality equipment so they could do there job to the best of there ability and keep the public safe.[27]

William McGroarty, retired from the New York City Police Department at the rank of Lieutenant Commander, currently working in the Middle East training Government Officials, writes:

> Throughout my working relationship with James there were times when I would have to call upon him in the early morning hours requesting assistance on investigations. James would not only help me with contact information and resources he would respond to the scene personally to ensure the proper actions were being taken. This again is a testament to his dedication to the citizens of his County.[28]

Paul V. Schreiber Sr., retired detective from the Suffolk County Police Department, writes:

> His compassion and sincerity in dealing with the intensity of the situation did not go unnoticed by the members of the Homicide Squad assigned there as well as by numerous Police brass and political figures who were also there. James and his men were personally recognized by the commander of the Homicide Squad for the excellent execution of their assignment.[29]

E. Lloyd Sobel, CEO/President of Empire Merchants, describes Mr. Burke as:

> A real law enforcement professional. He has tremendous passion to make Suffolk County a better place to live and raise family.[30]

Dr. Lynn Pierri writes:

---

[27] *See* **Exhibit 27.**
[28] *See* **Exhibit 28.**
[29] *See* **Exhibit 29.**
[30] *See* **Exhibit 30.**

I hope that all the good that James Burke has done for the Suffolk County Police Department over his lifetime of service may be taken into consideration at this difficult time.[31]

Michael J. Shalley, a former NYPD officer and a retired fireman, writes:

Jim is an extremely intelligent gentleman with love and respect for his fellow Police Officers and the people of Suffolk County…He has earned the respect of the rank and file and has a proven record as a competent leader.[32]

Peter J. Quinn, retired Chief of the Suffolk County Police Department,

Vietnam veteran and Purple Heart winner, writes:

I have always found him to be an outstanding police officer in every position he held. He was totally dedicated to policing and serving the citizens of Suffolk County.[33]

Dennis W. Delaney, retired detective from the Suffolk County Police Department

after 40 years of service, Vietnam Bronze Star veteran, and recipient of the Suffolk

County Medal of Honor, writes:

James Burke did a tremendous amount of hard work a lot of good for the residents of Suffolk County during his service to the Suffolk County Police Department. He took special interest in the Suffolk County Police Department's ceremonies, especially where the department was honoring the fallen members of the Suffolk County Police Department. He spoke eloquently at these ceremonies, which brought comfort and honor to the attending families and invited quest.[34]

Natalie Perez, detective with the Buffalo Police Department, writes:

I have found him always to be professional honest, hard working and a credit to law enforcement.[35]

Walter Walsh, a New York City Police Officer in the 102nd precinct, writes:

---

[31] *See* **Exhibit 31.**
[32] *See* **Exhibit 32.**
[33] *See* **Exhibit 33.**
[34] *See* **Exhibit 34.**
[35] *See* **Exhibit 35.**

James is an outstanding, kind and intelligent person who is extremely dedicated to his job as Chief of Suffolk County Police. There are hundreds of police officers in New York who owe their successful careers to James.[36]

**C.     Accolades and Commendations**

Throughout the years, Mr. Burke's career in law enforcement had been marked with many remarkable accomplishments and professional achievements. In terms of commendations, he is among the top 100 most decorated officers in the history of the Suffolk County Police Department.  He has earned 40 commendations, two meritorious service awards, an exceptional police service award, an excellent police duty award, the Daniel P. Guido Leadership award, the Peter J. Beigen Award for Community Service, two international narcotics enforcement officer association awards, and the police officer of the year award. He graduated number 2 in the NYPD's class of 1985. He was the valedictorian and number one in SCPD's class of 1986 as well as the recipient of four awards at graduation.

Mr. Burke is particularly dedicated to honoring our country's service members, as many of his loved ones have served in the military, including his grandfather and two uncles, one of whom died in battle. He regularly organizes ceremonies in their honor. On the 70th anniversary of the Normandy Landings, Mr. Burke put together a ceremony for veterans. For the past four years, Mr. Burke has orchestrated a special ceremony and luncheon for a D-Day veteran and Suffolk County local, Frank Agoglia. Over 90 years of age, Agoglia has also served in the NYPD. When Mr. Burke discovered Agoglia's exceptional service to this country, he decided he should be honored. As Frank Agoglia writes:

---

[36] *See* **Exhibit 36.**

> Chief Burke learned of the ceremony held at S.B.U. and ultimately
> arranged for a luncheon in my honor at Yaphank Police Headquarters
> around D-Day in 2012…I had nothing but respect for Chief Burke and still
> do.[37]

Louis Delli-Pizzi, a law enforcement officer and former Army infantry

officer, writes:

> In my professional capacity I have known James as the highly regarded
> and respected Chief of the Suffolk County Police Department (SCPD).  In
> his career, Former Chief Burke earned a reputation amongst National law
> enforcement professionals as respected and innovative senior leader.
> Former Chief Burke is well known amongst his professional peers for
> developing an expertise in leadership development and for engineering
> intelligence lead policing in Suffolk County, New York.   As the Former
> Chief of SCPD, James is also known for his selfless and unwavering
> support of veterans.  This support includes Suffolk County's innovative
> program to respond to incidents involving veterans.   As the commander
> of the largest Infantry unit on Long Island, numerous returning combat
> veterans and soldiers under my past command have interacted with the
> SCPD.  As a result of this innovative program countless veterans have
> benefited from SCPDs problem solving, mental health sensitivity, and
> social service approach to police interaction with veterans.[38]

Daniel J. Murphy, attorney, former Suffolk County prosecutor, retired law

secretary to State Supreme Court Justice Peter Fox Cohalan, and father to famed Medal

of Honor winner, Michael Murphy, writes:

> This is a man committed to our military and our veterans…Chief Burke is
> a good man who allowed himself to over-react personally to an individual
> under arrest. While that person's criminal conduct does not excuse Chief
> Burke's actions, they help explain what occurred.[39]

Mr. Burke's dedication to the veterans in his community is only one of the many ways he

has helped and encouraged those around him. Mr. Burke is loved and respected within his

---

[37] *See* **Exhibit 37.**
[38] *See* **Exhibit 38.**
[39] *See* **Exhibit 39.**

community and has a reputation as an honest, hard-working, and compassionate officer.

His friends and neighbors all admire the work he has done in the community.

Roger Smith, former Commodore of the Smithtown Bay Yacht Club, writes:

The Jim Burke I know is wonderful individual, who goes out of his way to help others…This is man who goes beyond his way to help others.[40]

Stephen Powers, former Commodore of Smithtown Bay Yacht Club, writes:

The reasons I'm writing this is to let you know how the silent majority or the forgotten man or Middle Class feels in Smithtown about Policemen like Chief Burke. We don't feel safer in our Homes, safer in our Schools and safer on the Streets of Long Island with him in Prison. In fact we feel much less safe.[41]

Thomas Tatarian, Suffolk County police officer, writes:

In November of 2013 I was diagnosed with a World Trade Center related cancer that required immediate surgery, and several follow up surgeries. At this time James was the Chief of the Department. He called me immediately offering any and all assistance the Department could give me and my family. He visited me daily at Stony Brook Hospital where I spent several weeks. He came to see me on Christmas Day.[42]

Geoffrey Costa, former U.S. Army captain, writes:

From our initial conversation with James, he took me under his wing and instantly served as a father figure…He was real sincere and cared only about my family and me doing what was best for us.[43]

Leslie Tricarick, neighbor, writes:

I know the bullying could have gone two ways for my son and without the help of James Burke at a crucial crossroads in my son's life I do not know where we would be today.[44]

Anthony N. D'Orazio, Mr. Burke's friend from high school, writes:

---

[40] *See* **Exhibit 40.**
[41] *See* **Exhibit 41.**
[42] *See* **Exhibit 42.**
[43] *See* **Exhibit 43.**
[44] *See* **Exhibit 44.**

> I could not be prouder of my friend, over the past 37 plus years he has achieved great success. I admire his dedication and commitment to his profession, police department, community, family and friends.[45]

Michael P. McGovern, veteran of the United States Navy and a firefighter for the

City of New York, writes:

> This man sat me down and asked me some onerous questions and told me some real truths about the path I was leading. This man was James Burke. Mr. Burke's influence as an upstanding citizen and a protector of his community played a pivotal role in my ultimate decision to join the United States Navy.[46]

Robert A. Matarazzo, Professor and Director of Security at Kingsbrook Jewish

Medical Center, a Criminal Justice Scholar, and a retired New York City Police Captain,

writes:

> To that end, I know him to be an altruistic, caring, forthright individual who considered the needs of the community paramount and second only to the needs of family and friends.[47]

Alfred James, retired police officer for the Suffolk County Police Department and

training officer for Mr. Burke, as well as owner and operator of The Massapequa Post

Newspaper, The Amityville Record Newspaper, and The Babylon Beacon Newspaper,

writes:

> I have always held Jim in the highest regard as a police officer and law enforcement official, and long admired his effectiveness and his strong understanding of the importance of community involvement.[48]

G. Joseph Dippell Jr., Vice Chairman for the Centurion Foundation, writes:

> I have always known him as a hardworking cop and he has been a pleasure to work with...He has earned my trust and respect for his honesty and

---

[45] *See* **Exhibit 45.**
[46] *See* **Exhibit 46.**
[47] *See* **Exhibit 47.**
[48] *See* **Exhibit 48.**

integrity and has been nothing but a gentleman to my wife, kids, and grandchildren.[49]

George Mullins, retired New York City Police Department Captain, retired

attorney, and current president of Police Tutorial Service, Inc., writes:

> During his time at P.T.S., James was appreciated by all. There are literally hundreds of police officers throughout New York State who owe their successful careers to James.[50]

Paul O'Donnell, retired New York City Police Department Sergeant and Mr.

Burke's former Police Tutorial Services student, writes:

> Very shortly after meeting James I realized that he was gifted instructor and more importantly a outstanding person. James not only taught the lessons with passion and understanding, he displayed a very personal and caring attitude toward his students and the police work he taught.[51]

Edward V. Ecker Jr., retired Chief of Police from the Town of East Hampton after

32 years of service, writes:

> I have always known Jim to be honest, hard-working, and intelligent." "He was an excellent instructor and motivator, and his passion for police work was evident.[52]

Eileen Barry, retired New York City Police Department Sergeant and Mr. Burke's

former student, writes:

> I came to know James as a loving and caring family man…I know James has help so many people in his life.[53]

Grant Hendricks, classmate with James in 2007 in the Energeia Partnership,

writes:

---

[49] *See* **Exhibit 49.**
[50] *See* **Exhibit 50.**
[51] *See* **Exhibit 51.**
[52] *See* **Exhibit 52.**
[53] *See* **Exhibit 53.**

The more I got to know James, the deeper my respect grew. He's not an average man…he's extraordinary....I've never felt safer than the times I was in the presence of James Burke.[54]

Nancy Engelhardt, the Founding Director of a regional leadership program in which James was a member, writes:

…I can only share that over the past 9 years since I have met Jim Burke, I have seen the best of him, devoted to his family, especially his mom, a loyal and generous friend who was a mentor to his colleagues and kind to strangers.[55]

John and Stacey Corvi write:

It was here and also in my community that I took notice of Jim's sense of community and overall caring of people. He would take time out to help a fellow neighbor with a safety issue…I have heard countless times how much of a help Officer Burke was to so many in my community.[56]

Honorable Paul J. Tonna, former Suffolk County Legislator and Presiding Officer, Executive Director of the Energeia Partnership, writes:

I believe Mr. Burke should not be sentenced without careful consideration and reflection upon the totality of his over 29 years of public service. Ultimately, while I am aware of his recent guilty plea and conviction, I strongly believe that his admitted wrongdoing pales in comparison to a career devoted to the administration of justice and passion for the safety of Suffolk County residents.[57]

John Freck, former Second Grade Detective from the Manhattan North Homicide Squad; Former president of the NYC Retired Detectives and remaining president of the Board of Directors; joined the Manhattan District Attorney's Office in 1995 as a Detective Investigator, writes:

---

[54] *See* **Exhibit 54.**
[55] *See* **Exhibit 55.**
[56] *See* **Exhibit 56.**
[57] *See* **Exhibit 57.**

One thing about James that stick out in my mind is after the 9/11 terrorist attack in New York was the commitment and tenacity from James to organize run fund raisers for the children of the 9/11 victims.[58]

John Corrado writes:

During the [social stewardship] program and then afterwards, Jim and I would meet at community events, again, demonstrating his interest in Long Island and the people he was chosen to serve.[59]

Patrick and Patricia McGovern write about Mr. Burke's influence of their son:

He was a mentor to Michael…a positive influence who advocated education and hard work and someone who could always be depended on if needed.[60]

## II.    PROCEDURAL BACKGROUND AND GUIDELINES CALCULATION

Pursuant to a written plea agreement, Mr. Burke pled guilty before this Court on February 26, 2016, to Count One: deprivation of rights under the color of law, in violation of 18 U.S.C. § 242; and Count Two: conspiracy to commit obstruction of justice in violation of 18 U.S.C. §§ 1512(k); 1512(c)(2). Pursuant to the plea agreement and the Pre-sentence Report, Mr. Burke's Guidelines range is 41 to 51 months' imprisonment, based on a total offense level of 22, Criminal History Category I, and the following offense level calculation:

**Count One: Deprivation of Civil Rights**

| | |
|---|---|
| Base Offense Level: (U.S.S.G. §2H1.1(a)(2)) | 12 |
| Defendant was a public official and committed the offense under the color of law: (U.S.S.G. §2H1.1(b)(1)) | +6 |
| Victim was physically restrained: | +2 |

---

[58] *See* **Exhibit 58.**
[59] *See* **Exhibit 59.**
[60] *See* **Exhibit 60.**

(U.S.S.G. § 3A1.3)

| | |
|---|---|
| Criminal activity involving<br>fewer than five participants:<br>(U.S.S.G. §3B1.1(c)) | +2 |
| Adjustment for obstruction of justice:<br>(U.S.S.G. § 3C1.1) | +2 |
| **Adjusted Offense Level (subtotal):** | **24** |

**Count Two: Conspiracy to Commit Obstruction of Justice**

| | |
|---|---|
| Base Offense Level:<br>(U.S.S.G. §2J1.2(a)) | +14 |
| Substantial interference with the administration<br>of justice (U.S.S.G. §2J1.2(b)(2)): | +3 |
| Abused position of trust:<br>(U.S.S.G. § 3B1.3) | +2 |
| The offense was otherwise extensive in scope[61]:<br>(U.S.S.G. § 2J1.2(b)(3)(C)) | +2 |

---

[61] While Mr. Burke does not intend to undermine the written plea agreement, we respectfully submit that a two-level enhancement pursuant to U.S.S.G. § 2J1.2(b)(3)(C) may not be a lawful enhancement and respectfully request the Court take into consideration its practical inapplicability.

Under U.S.S.G. §2J1.2(b)(3)(C), when computing the offense level for an obstruction of justice count, two levels may be added if the offense "was otherwise extensive in scope, planning, or preparation…" This enhancement is seldom used, and as a result, controlling case law is scarce. However, Courts in other districts have typically upheld such enhancements for elaborate and complex schemes. For example, in *United States v. Jensen*, 248 F. App'x 849, 851 (10th Cir. 2007), the Court upheld such an enhancement when the defendant, a correctional officer who bribed inmates in exchange for favors, had a history of "extreme and repetitive misconduct." *Id.  See also United States v. Petruk*, No. 15-2547, 2016 WL 4709118, at *1 (8th Cir. Sept. 9, 2016) (upheld the enhancement when defendant crafted a scheme whereby an individual playing a fictional character would provide a false confession to the defendant's crimes in a phone conversation that jail officials would overhear and record.); *United States v. Rodriguez,* 499 Fed.Appx. 904, 909 (11th Cir. 2012) (upheld enhancement to a prison inmate who preserved a semen stain on her clothing and falsely claimed three times she was sexually assaulted by a corrections officer); *United States v. Bakhtiari*, 714 F.3d 1057, 1062 (8th Cir. 2013) (upheld enhancement where defendant's threats to another individual included obtaining photographs of the person's house and family, creating a false email account, and otherwise planning and disguising his actions).

As stated in the Pre-Sentence report, Mr. Burke engaged in discussions about the subpoenas and impending testimony of Suffolk County Police Department officers. While not minimizing the seriousness of the offense, there is nothing in the record of this matter that suggests Mr. Burke crafted a complex scheme to obstruct. With this being said, Mr. Burke accepts responsibility but the extensive in scope enhancement may not apply.

| | |
|---|---|
| Conspiracy involved five or more participants: (U.S.S.G. §3B1.1(a)) | +4 |
| **Adjusted Offense Level (subtotal):** | **25** |
| **Total Adjusted Offense Level:** (U.S.S.G. §3D1.3(a)) | **25** |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)-(b)) | -3 |
| **TOTAL OFFENSE LEVEL:** | **22** |

With zero criminal history points, level 22 correlates to 41 to 51 months' imprisonment. However, for the below reasons, we respectfully submit that a non-Guidelines sentence is warranted.

## III.   LEGAL AUTHORITY IN SUPPORT OF A NON-GUIDELINES SENTENCE

In determining an appropriate sentence, the sentencing court is directed to "impose a sentence sufficient but not greater than necessary, to comply with . . . the need for the sentence to: (A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). Courts are directed to consider the advisory Sentencing Guidelines and its policy statements, the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a);

20

*United States v. Cavera*, 550 F.3d 180, 189-190 (2d Cir. 2008); *United States v. Crosby*, 397 F.3d 103, 111-12 (2d Cir. 2005).

A district court should "ordinarily 'begin all sentencing proceedings by calculation of the applicable Guidelines range.'" *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) (citing *Gall v United States*, 552 U.S. 38, 46 (2007)). However, calculation of a defendant's advisory guidelines does not end the Guidelines' analysis. Rather, because "[t]he fact that a given guidelines range may apply does not always mean that it should." *United States v. Ingram*, 721 F.3d 35, 38 (2d Cir. 2013) (Calabresi, J, concurring).

The Guidelines are not to be presumed to be correct.  In *Nelson v. United States*, 129 S. Ct. 890 (2009), the Supreme Court instructed that, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson*, 129 S. Ct. at 892 (emphasis in original).  The Second Circuit has also recognized that "[r]arely, if ever do the pertinent facts dictate one and only one appropriate sentence but rather experienced district judges may reasonably differ." *United States v. Jones*, 531 F.3d 163, 173 (2d Cir. 2008). Thus, although the Guidelines are an important factor in the sentencing analysis, they are advisory and the Court is generally free to impose a non-Guidelines sentence.  *United States v. Gall*, 128 S. Ct. 586 (2007); *United States v. Booker*, 543 U.S. 220 (2005).

A sentencing court must consider what weight to accord the Guidelines in its assessment of all the 3553(a) factors. It is well settled that whatever deference is due to a guideline depends heavily on whether the Commission acted in "the exercise of its characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 96 (2007).

That role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita v. United States*, 551 U.S. 338, 349-350 (2007) (quotations omitted). Thus, while the Guidelines must be considered by the Court, it is not an abuse of discretion for a court to vary from the Guidelines sentence even in a run-of-the-mill case based solely on policy consideration, or because a specific guideline fails to reflect § 3553(a) considerations, or fails to incorporate defendant characteristics, or is not based on empirical evidence, or is not based on national experience. *See Kimbrough,* 552 U.S. at 96; *Gall,* 552 U.S. at 46 & n. 2; *Nelson v. United States,* 555 U.S. 350 (2009).  In short, the sentencing court may not halt the sentencing analysis after its consideration of the Guidelines but rather must consider all the remaining 3553(a) factors and consider whether a variance from the advisory applicable Guidelines range is warranted in light of the other sentencing factors. *See Cavera,* 550 F.3d at 189. Thus, the advisory Guideline calculation is not complete until the sentencing court considers the application of downward departures. *Ingram*, 721 F.3d at 38 (Calabresi, J., concurring).

## IV.    A NON-GUIDELINES, NON-INCARCERATION SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO SATISFY THE SENTENCING GOALS OF 18 U.S.C. § 3553(a)

The defense respectfully submits that a non-Guidelines, non-incarceration sentence of time served with probation is sufficient, but not greater than necessary, to satisfy the sentencing objectives of 18 U.S.C. § 3553(a) and would be just.

### A. Probation Is Punishment and A Sentence of Probation Would Satisfy the Four Goals of Sentencing

In consideration of the time Mr. Burke has already served during the pendency of this case, probation is punishment and a non-incarceration sentence of time served would undoubtedly meet the four goals of sentencing.  "Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007).  As *Gall* summarized, "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court." *Gall*, 552 U.S. at 48.

In Mr. Burke's case, a probationary sentence would:

(A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense,
(B) afford adequate deterrence to criminal conduct;
(C) protect the public from further crimes of the defendant; and
(D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

*See* 18 U.S.C. § 3553(a).

First, Mr. Burke's offenses, while gravely serious, occurred in a truncated timeframe, particularly in regard to the obstruction count. From December 2013 until June 2015 – for a year and a half – Mr. Burke had no idea that an FBI investigation was still pending and believed the case against him to be closed. In consideration of a thirty-year law enforcement career, the time Mr. Burke already has served incarcerated is more

23

than sufficient for him to realize the consequences of his actions. A probationary sentence would still restrict his freedom, in that his every move will be supervised and monitored. For a person in Mr. Burke's position, this fact alone is punishment.

Further, the collateral consequences of being a convicted felon pose their own punishment. As Judge Block has recently opined: "There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction." *United States v. Nesbeth*, 2016 WL 3022073, at *1 (E.D.N.Y. 2016). In *Nesbeth*, Judge Block granted a non-incarceration sentence to the defendant, who faced a 33 to 41 month Guidelines range, in part due to the collateral consequences that would subsequently affect her life as a convicted felon. Judge Block extensively discusses all the ways in which a felony conviction will change a defendant's life.

> The range of subject matter that collateral consequences cover can be particularly disruptive to an ex-convict's efforts at rehabilitation and reintegration into society. As examples, under federal law alone, a felony conviction may render an individual ineligible for public housing, section 8 vouchers, Social Security Act benefits, supplemental nutritional benefits, student loans, the Hope Scholarship tax credit, and Legal Services Corporation representation in public-housing eviction proceedings. Moreover, in addition to the general reluctance of private employers to hire ex-convicts, felony convictions disqualify individuals from holding various positions. *Id.* at *5

The collateral consequences of Mr. Burke's conviction are undoubtedly massive. After dutifully serving the police force for 30 years, Mr. Burke can no longer work in the career he loves. Mr. Burke's employment options are drastically limited, as he can no longer work as a public employee, private investigator, security officer, or teacher. His felony conviction makes it impossible to obtain most professional licenses. Furthermore,

his professional reputation and work history have been irreconcilably damaged, a fact he must battle with each day. As an otherwise law-abiding citizen with an exemplary record of charitable works and good deeds, he can no longer serve his community as a public servant. He cannot take part in his civic duty to vote nor can he serve as a juror. Lastly, as a former police officer responsible for the arrests of thousands of people, many of whom are very dangerous, Mr. Burke can no longer protect himself and his home due to his inability to possess a firearm. In consideration of Mr. Burke's history, the consequences he has already suffered and will continue to experience are sufficient punishment.

Second, a sentence of time served would likewise provide adequate specific and general deterrence. Certainly, Mr. Burke will never commit another crime. As a thirty-year law enforcement officer who has experienced nearly a year in prison, Mr. Burke has had ample time to reflect on the seriousness of the offense as well as plan for his future. Mr. Burke undoubtedly will be deterred from ever committing another crime again.  It is common knowledge that an offender with strong family ties and responsibilities poses a low risk of recidivism.  *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12-13 & Ex. 10 (2004); U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* 8 (2004); Shirley R. Klein, et al., *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."); Phyllis J. Newton, Jill Glazer & Kevin Blackwell, *Gender, Individuality and the Federal Sentencing Guidelines*, 8 Fed. Sent'g Rep. 148 (1995) "[T]he better family ties are maintained[,] the lower the recidivism rate."); U.S. Sent'g Comm'n Staff

25

Discussion Paper, *Sentencing Options Under the Guidelines* (1996) (acknowledging the "criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties."). In addition, Mr. Burke's age is a factor indicative of low recidivism, as first-time offenders over 50 years of age are less likely to commit another offense in their lifetime. Further, Mr. Burke has accepted responsibility for his crimes as evinced in pleading guilty six weeks after his arrest.

 With respect to general deterrence, Mr. Burke respectfully submits that time served and a probationary sentence is sufficient to deter any individual, particularly a law enforcement officer, from committing similar offenses. The incarceration without bail of the Chief of Department has certainly already sent a chilling effect throughout local police departments and beyond. In regard to Mr. Burke's particular department, the need for general deterrence is quite low, as the members of the Suffolk County Police Department have not been criminally charged with a police brutality case since 1998, which resulted in the acquittal of the officer, Timothy McGuire. Therefore, the time Mr. Burke has already spent incarcerated is certain to address any general deterrence concerns.

 With respect to the third goal of sentencing, Mr. Burke respectfully submits that there is no need for incarceration in order to protect the public from any future crimes. As discussed above, Mr. Burke's risk of recidivism is slim to none.  He recognizes the toll that the instant prosecution has taken on everyone whom he holds dear and is not likely to risk their wellbeing for anything.

Finally, with respect to the fourth goal of sentencing, Mr. Burke respectfully submits that he is not in need of any services that a correctional institution could provide more expeditiously or cost-effectively than he could himself.  Instead, incarcerating Mr. Burke would only deprive him of the ability to take care of his sickly mother and to serve his community. As Mr. Burke plans to dedicate his time to helping other inmates in re-entry programs once he is released, a non-incarceration sentence would allow him to better serve the public. Mr. Burke is uniquely situated in his ability to make a difference with respect to re-entry and recidivism reduction given his law enforcement experience and his time served in prison. In the alternative, a sentence of home confinement would restrict his freedoms yet also allow him to care for his mother. Either way, any rehabilitation efforts would be better served with Mr. Burke released from incarceration.

Therefore, a sentence of time served and probation would be sufficient, but not greater than necessary in this case to meet all of the sentencing goals of 18 U.S.C. § 3553(a) and would be appropriate in this case.

**B.    A Probationary Sentence Would Avoid Unwarranted Sentencing Disparities**

The factors that must be considered by the Court when imposing a sentence according to 18 U.S.C. § 3553(a) are as follows:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed;

(3)    the kinds of sentences available;

(4)    the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the U.S. Sentencing Guidelines;

(5)    any pertinent policy statement;

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)      the need to provide restitution to any victims of the offense.

In consideration of the factors enumerated under 18 U.S.C. § 3553(a), we respectfully submit that a probationary sentence of time served, in consideration of the other kinds of sentences available, would be more than sufficient. Without minimizing the severity of the offense, we respectfully submit that such a sentence would be in line with other similarly situated defendants. In contrast, the sentences of defendants whose conduct was more egregious, and thus, whose sentences were higher, would be proportionate to time served in this particular instance. Below is a chart that outlines the sentences of other similar and dissimilar defendants in this District.

| Case | Holding | Sentence |
|------|---------|----------|
| *U.S. v. Spaulding*, 631 Fed.Appx. 5 (2d Cir. 2015) | Defendant repeatedly harassed Latino business owners and intimidated patrons in violation of the Fourth Amendment. Defendant also physically assaulted a priest. Convicted of excessive use of force, false arrest, and obstruction of justice by authoring a false police report regarding the arrest. | Received 60 months' imprisonment, within sentencing guidelines after convicted at trial |
| *U.S. v. Cari*, 631 Fed.Appx. 5 (2d Cir. 2015) | Defendant convicted of false arrest and obstruction of justice by authoring a false police report based on the above case. Cari arrested an individual taking a video during encounter and then authored a report stating that the he was carrying a weapon and he belligerently resisted arrest. | Received 30 months' imprisonment after convicted at trial |
| *U.S. v. Gray, et al.*, 421 Fed.Appx. 11 (2d. Cir. 2011) | Convicted of conspiracy to obstruct justice, Gray falsely stated and represented to a Special Agent of the Office of Inspector General that he did not see co-defendant Wells use force against or strike "John | 6 months' imprisonment and 3 years' supervised release after convicted at trial |

| | Doe." | |
|---|---|---|
| *U.S. v. Wells, et al.,* 421 Fed.Appx. 11 (2d. Cir. 2011) | Corrections officer Wells had an inmate strip naked in the shower, then struck the inmate in the chest and throat, making the inmate's head hit the concrete wall, resulting in hospital treatment. When an investigation began, Wells instructed the others to say that no force had been used. | 1 year and 1 day imprisonment after convicted at trial |
| *U.S. v. Cossette,* 593 Fed.Appx. 28 (2d. Cir. 2014) | Convicted of willful deprivation of civil rights and obstruction of justice for assaulting a detainee who was already handcuffed in a holding cell and compliant with the police. The detainee suffered head trauma and deep lacerations. | 14 months' imprisonment |
| *U.S. v. Livoti,* 196 F.3d 322 (2d. Cir. 1999) | Police officer convicted of deprivation of civil rights after choking victim to death. | 90 months' imprisonment, guidelines range 78-97 months |
| *U.S. v. Walsh,* 194 F.3d 37 (1999) | Corrections officer convicted of deprivation of civil rights after assaulting inmate sexually by stepping on victim's penis. | 24 months' imprisonment |

The above cases illustrate the spectrum of misconduct that this Court has seen in the context of deprivation of civil rights cases. By any measure, Mr. Burke's conduct falls on the low end of severity, as the aforementioned cases involve serious injury, sexual assault, and death. However, the majority of these defendants received sentences lower than the Guidelines range Mr. Burke faces. In order to avoid unwarranted sentencing disparities of similarly situated defendants, it would be incumbent upon the Court to consider these more severe cases and fashion a sentence for Mr. Burke that represents his own circumstances.

Furthermore, there is also a need to avoid unwarranted sentencing disparities on a national level. The Second Circuit has held that 18 U.S.C. § 3553(a)(6) "requires a district court to consider nationwide sentence disparities." *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). The intent of the Sentencing Reform Act of 1984, was "to reduce the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders." *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006) (internal citations omitted); *See also United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007) (the primary purpose of the provision was to reduce unwarranted sentence disparities nationwide).

The U.S. Sentencing Commission's statistics for civil rights offenses for the years 2008 to 2012 show that "[t]he average length of sentence for those years ranged from 22.5 months to 39.1 months (mean) and from 8 months to 14.5 months (median)." *United States v. Dautovic*, 763 F.3d 927, 933 (8th Cir. 2014). Due to the relative infrequency of civil rights cases, we respectfully submit the Court consider some of the sentencing trends for such offenses across districts. *See United States v. Frazier*, 2013 WL 499245, at *8 (D.N.M. 2013) (Defendant deputy sheriff received three years' probation for assaulting the victim and causing bodily injury. The Court held that, "[w]hile being a convicted felon is a stain on every defendant's record, Frazier has been an active participant not only in his community as a law enforcement officer, a position he can have no longer, but he has also been an active participant in our democracy by exercising his right to vote throughout his lifetime. This right is one that, as a convicted felon, he can exercise no longer."); *United States v. Cozzi*, 613 F.3d 725, 734 (7th Cir. 2010) (upheld 40-month sentence of officer who shackled victim to a wheelchair and

bludgeoned him with a weapon); *United States v. LeMoure*, 474 F.3d 37, 46 (1st Cir. 2007) (Defendant sentenced to 48 months' imprisonment, with a Guidelines range of 51 to 63 months', for physically assaulting a motorist then recruiting witnesses to falsely testify at an internal review board hearing); *United States v. Harris*, 408 F.3d 186, 187 (5th Cir. 2005) (Defendant, Chief of Police for Golden, Mississippi, sentenced to 15 months' imprisonment for hitting victim in the head); *United States v. Gray*, 692 F.3d 514, 519 (6th Cir. 2012) (Defendant officer, convicted of strangling the victim to death and facing 41 to 51 months, received 36 months' imprisonment due to his history of public service.); *United States v. Wilson*, 344 F. App'x 134, 138 (6th Cir. 2009) (Defendant corrections officer sentenced to 33 months' imprisonment for restraining an inmate in a straight jacket for three weeks, twelve hours a day); *See also* https://www.justice.gov/usao-cdca/pr/paul-tanaka-former-no-2-los-angeles-sheriff-s-department-sentenced-five-years-federal *(*Defendant Paul Tanaka, second in command of the Los Angelos Sheriff's Department, received 60 months' imprisonment for obstructing a federal investigation of civil rights violations by sheriff deputies in jail complexes).

Therefore, in consideration of the above examples, we respectfully submit that a probationary sentence of time served would be warranted.

## C.    Consideration of Mr. Burke's Family Circumstances is Warranted

Although "family ties and responsibilities are not ordinarily relevant," to a sentencing decision, U.S.S.G. § 5H1.6 Policy Statement, "'[n]ot ordinarily relevant' is not synonymous with 'never relevant' or 'not relevant.'" *United States v. Monaco*, 23 F.3d 793, 801 (3d Cir. 1994). It is well settled that the federal courts have imposed non-incarceration sentences on individuals whose imprisonment would create exceptional and

31

devastating consequences for their families. *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997). The Second Circuit has recognized that, "[t]he intended beneficiary of a family circumstances departure is not the defendant but his dependents." *United States v. Greene*, 249 F. Supp. 2d 262, 266 (S.D.N.Y. 2003) (quoting *United States v. Johnson,* 964 F.2d 124, 129 (2d Cir. 1992)). Thus, "[s]entencing courts must . . . focus on the vulnerability of these dependents, assessing the hardships that a sentence of incarceration would impose on them." *Id*. (referencing *United States v. Faria,* 161 F.3d 761, 762 (2d Cir.1998)) ("[W]e have upheld downward departures based on family circumstances 'where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments.'") (quoting *United States v. Sprei,* 145 F.3d 528, 535 (2d Cir. 1998)). Furthermore, "a defendant's family circumstances are part of [his] history and characteristics." *United States v. Roberts*, 2005 WL 1153757 at *5 (S.D.N.Y. 2005) (granted time served in consideration of defendant's role as the sole care-taker for his chronically ill and disabled life partner).

In determining whether a downward departure is warranted based on family ties and responsibilities, the Court shall consider the following non-exhaustive list of circumstances: "(i) the seriousness of the offense; (ii) the involvement in the offense, if any, of members of the defendant's family; (iii) the danger, if any, to members of the defendant's family as a result of the offense." U.S.S.G. § 5H1.6 Policy Statement, Application Note 1(A).

While not requesting a departure, Mr. Burke respectfully requests the Court consider his mother's poor health at sentencing. Mr. Burke's mother, Frances, is not just a sickly woman, rather, a miracle. Diagnosed with Stage IV lung cancer nearly seventeen

years ago, Frances has sustained by the perseverance and dedication of her son's care. When first diagnosed, Mr. Burke was incredibly hands-on and conducted his own research on doctors and treatment plans. Because Frances is wheelchair-bound and dependent upon an oxygen tank, it is very difficult for her to visit Mr. Burke while he is in custody.

Frances' condition is quite extraordinary. She is currently under the care of five doctors and undergoes immunotherapy every few weeks. She undergoes weekly blood tests and is on numerous medications, which requires frequent visits to the doctor and pharmacy. She requires a 24-hour a day oxygen tank so oxygen deliveries are made to the home several times a week. The threat of a power outage affecting her oxygen supply always looms. She requires rehabilitation therapy and exercise and special dietary needs.

Mr. Burke's crimes, which certainly have no connection to his mother, are disproportionately affecting her the most. Further, in the time that Mr. Burke has been imprisoned, Frances' health has declined and is suffering from a reoccurrence of cancer on her lymph nodes. The loss of her son's care has directly impacted Frances, as her other children do not have the means to care for her like Mr. Burke. Although Mr. Burke's younger brother, John, lives in the home, he simply has not been able to rise to the exceptional standard of care Mr. Burke has been able to give to his mother in order to ensure her survival. As a sergeant for the NYPD intelligence squad, John works long, erratic hours and is never home. It is without question that Mr. Burke's care and support cannot be replaced. As Robert Hill, a relative and friend for over 30 years, writes: "I have seen Jimmy dedicate his life to the care of his mother…Without his positive

reinforcements it has been a battle for the family to fill his shoes."[62] Even Frances'

physician is aware of Mr. Burke's dedication. Kenneth Prager, a pulmonologist at

Columbia University Medical Center, writes:

> He has demonstrated impressive devotion to his mother and has clearly gone out of his way to ensure that she has received the best possible medical care for her multiple and very substantial illnesses. I have always found Mr. Burke to be very respectful and very appreciative of the care rendered to his mother.[63]

Patricia and Nalio D'Orazio, long-time friends, write:

> Jim's step father passed away and Jim felt a strong need to watch over his mother…during her recovery and after he would shop for her, take care of things around the house and do any thing to help make her life a little easier. Jim has suffered so much already.  His Mother, family and friends has suffered so much. Please release him.[64]

Therefore, Mr. Burke respectfully requests that the Court consider his family

responsibilities at sentencing.

## V.   ADDITIONAL INFORMATION FROM FAMILY AND FRIENDS

The totality of the circumstances, including Mr. Burke's character and the nature

and circumstances of the offense, may be taken into account in reaching a determination

as to the appropriate sentence. *See* John M. Walker, Jr., *Loosening the Administrative

Handcuffs: Discretion and Responsibility Under the Guidelines*, 59 Brook. L.Rev. 551

(Summer 1993).  For this reason, the following additional letters are attached as further

supporting documents for the Court's review and consideration.

John F. Ragano, attorney and family friend, writes:

---

[62] *See* **Exhibit 61.**
[63] *See* **Exhibit 62.**
[64] *See* **Exhibit 63.**

I understand fully that his recent problems are serious but I hope a life filled with good deeds, compassion and dedication to service will enter into your decision when he is sentenced.[65]

John Breen, a lawyer and Mr. Burke's high school social studies teacher and

friend for more than 35 years, writes:

I was saddened to learn of Mr. Burke's transgressions and know that he is a better man than the one being portrayed by the media and the charges against him.[66]

Heather Volino, a former long-term girlfriend, writes:

Jim provided a safety net for me and my daughter. We loved to go fishing and some 'family types' of things which provided us with wholesome and positive experiences.[67]

John R. Durso, President of LI Federation of Labor AFL-CIO, writes:

Someday all of us will be judged by another and I pray that he or she will take into consideration of all the good we have done or tried to do for others when our day of sentencing arrives.[68]

Kim Bauer, Farmingdale School District Teacher Aid and cousin, writes:

I have always looked to him as a role model. Ever since I can remember, Jimmy always wanted to make a positive difference and assumed responsibility for all those around him…The past few years he has been the primary caretaker for my Aunt, his mother. It has been difficult to say the least without his guidance and presence within our family.[69]

Daniel Bauer writes:

Throughout his long career, he has managed to stay close to his family and thus relied upon for guidance and support.[70]

Gwen O'Shea writes:

---

[65] *See* **Exhibit 64.**
[66] *See* **Exhibit 65.**
[67] *See* **Exhibit 66.**
[68] *See* **Exhibit 67.**
[69] *See* **Exhibit 68.**
[70] *See* **Exhibit 69.**

An individual that has an understanding of the complexities of the issues that people face, a commitment to helping others (including strangers) and a desire to work collectively to make Long Island a better place.[71]

Kenneth S. Pepe, retired after 22 years of service from the New York City Police Department in the rank of Sergeant, writes:

James was an excellent instructor, gentleman, and a consummate professional.[72]

Kerri Greisheimer writes:

I came to know James as a loving and caring family man and an all-around great person. I have always been so proud to say I know him and talk of his accomplishments as a police officer. I have also always admired his dedication to his family, his mother and his brothers.

Paul Greisheimer, retired police officer from Nassau County, writes:

He is a great guy and was a facilitator for a police tutorial class that I attended.[73]

Paul J. Grub, Mr. Burke's brother-in-law and active duty detective with the New York City Police Department assigned to the Intelligence Bureau, writes:

This is a man who has poured his entire being into serving as a law enforcement agent, forgoing the traditions of marriage and family to serve his community without distraction. One could only hope to reach a fraction of his success and be as highly regarded as James Burke in his career and in life.[74]

Frank Shea, long time friend, writes:

From the outside looking in I admired his zest for improving the Police Department and in particular his desire to root out corruption in Suffolk County…His mom has been very ill over the past few years with cancer and he never once neglected his love and care for her.[75]

---

[71] *See* **Exhibit 70.**
[72] *See* **Exhibit 71.**
[73] *See* **Exhibit 72.**
[74] *See* **Exhibit 73.**
[75] *See* **Exhibit 74.**

Tracy A. Stigliano writes:

In September of 2011 I learned that my mother was diagnosed with stage 4 lung cancer…As soon as Jimmy was made aware of my situation he made a point to sit with me to share all that he had learned about the diagnosis…Thanks to his advice and guidance my mother was a cancer survivor.[76]

Vincent P. McLaughlin writes:

His willingness to provide assistance to my 90 year old parents many times over the years is greatly appreciated. Jimmy often asked in his caring and sincere voice 'how are your Mom and Dad?' My family and I have always held Mr. James Burke in the highest regard.[77]

John Westerman writes:

Jimmy always impressed me as an extremely dedicated and concerned public servant who took seriously his obligations to protect and serve all citizens. He could always be counted on to help in any public or personal dilemmas.[78]

Kathleen Dominy writes:

I have always known Jim to be kind, honest, generous, compassionate, a man of integrity, true to his word, committed to his profession, respectful in his treatment of me and others.[79]

Peter Guttieri writes:

In his early career I was concerned for the risks he was taking in undercover work, at the same time admiring him for his accomplishments…I can testify Jim Burke is a very good person and deserves leniency.[80]

Richard Kaiser, Registered Nurse and retired New York City Police Officer,

writes:

---

[76] *See* **Exhibit 75.**
[77] *See* **Exhibit 76.**
[78] *See* **Exhibit 77.**
[79] *See* **Exhibit 78.**
[80] *See* **Exhibit 79.**

James encouraged me to go back to college to pursue a nursing career. He knew nothing about nursing, but offered to help me study if I needed him to…James was an invaluable support system not only to me but to many.[81]

Angela Linda Sambus, long-time friend, writes:

The Jimmy I know is a caring family man and a dear friend. He is a man of fine qualities, but his kindness and his ability to connect to all people from the youngest of children to the elderly is what I consider his best one.[82]

Kathleen Stabile writes:

James has always been a loving, caring, hardworking and respectful person. Who is always willing to lend a helping hand to anyone in need.[83]

Dr. Enrico Mango writes:

Over the years we boated together, I remember at least one occasion where James was the first to respond to a potentially life threatening boating accident on Smithtown Bay. He always put his fellow member's needs first without regard to his own safety.[84]

Ed and Barbara Richardson write:

He would always be the one to stay behind with a fellow boater if they broke own. He was always the one offering to help anybody with anything and he was always very positive and a lot of fun.[85]

Peter Tartaglia, retired New York City Police Department Lieutenant in

the Major Case Detective Squad, writes:

I have become familiar with him both socially and professionally and have at all times known him to have sound judgment and self-restraint.[86]

Danielle Wischert, Mr. Burke's cousin, writes:

 Growing up James always looked after me and treated me like a sister. I have always looked up to him for being such an incredible, kind hearted,

---

[81] *See* **Exhibit 80.**
[82] *See* **Exhibit 81.**
[83] *See* **Exhibit 82.**
[84] *See* **Exhibit 83.**
[85] *See* **Exhibit 84.**
[86] *See* **Exhibit 85.**

loving person, who always gone above and beyond to help not only his friends and family but complete strangers.[87]

## **CONCLUSION**

For the foregoing reasons, and in light of the particular history and characteristics of Mr. Burke, we respectfully submit a non-incarceration sentence would be sufficient but not greater than necessary to meet all of the goals of 18 U.S.C. § 3553(a) and would appropriately temper justice with mercy in this case.

Thank you for your consideration of this submission on behalf of Mr. Burke.

Respectfully submitted,

_____/s/_____
John Meringolo, Esq.

CC: All counsel (via ECF)

---

[87] *See* **Exhibit 86.**

39