

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NB:JJD/LTG
F. #2015R01885

*610 Federal Plaza*
*Central Islip, New York 11722*

October 31, 2016

**By Hand and ECF**
The Honorable Leonard D. Wexler
United States District Judge
United States District Court
Eastern District of New York
940 Federal Plaza
Central Islip, New York 11722

>  Re: United States v. James Burke
>  Criminal Docket No. 15-627 (LDW)

Dear Judge Wexler:

The government submits this letter in anticipation of the defendant James Burke's sentencing, which is currently scheduled for November 2, 2016. For the reasons set forth below, the government strongly urges the Court to sentence the defendant to 51 months' incarceration, as this sentence is sufficient but not greater than necessary to reflect the seriousness of the defendant's offenses, to promote respect for the law, to provide just punishment for the offenses, to deter the defendant and others in his position from engaging in these illegal and abusive acts and, finally, to protect the public from further crimes of the defendant.

### I. The Charges

On February 26, 2016, the defendant, the former Chief of Department for the Suffolk County Police Department ("SCPD"), pled guilty to both counts of the above-referenced indictment, which charged him with a civil rights violation, in connection with the December 14, 2012 assault of an in-custody defendant ("John Doe"), in violation of 18 U.S.C. § 242, and then spearheading an extensive conspiracy to obstruct the federal investigation into that assault, in violation of 18 U.S.C. § 1512(k).

### II. The Guidelines

According to the Probation Department, the defendant's total offense level is 22 and he is a Criminal History Category I, which together yield an advisory Guidelines sentence of 41 to 51 months' incarceration. Pre-Sentence Investigation Report ("PSR") at ¶ 66, as amended by the Addendum to the PSR ("Addendum"). The government and the defendant

concur with this calculation, which is consistent with the Guidelines estimate in the plea agreement, to which the defendant stipulated.[1]

On October 27, 2016, the defendant filed a sentencing memorandum ("Def. Mem.") requesting a sentence of time-served, less than 11 months, based on his self-described "extraordinary career history, unique family circumstances and genuine acceptance of responsibility." Def. Mem. at 1. For the reasons set forth below, the government respectfully submits that, after considering the defendant's advisory Guidelines range and the factors set forth in 18 U.S.C. § 3553(a), in particular: the seriousness of the defendant's conduct, including the extent and brazenness of the efforts by the defendant and his co-conspirators to obstruct the federal investigation, and the defendant's leadership position in the SCPD, the Court should sentence the defendant to 51 months in prison, the high-end of the advisory Guidelines range.

### III. Factual Background

As set forth in the PSR, the defendant's arrest and conviction resulted from an almost three-year federal investigation conducted by the United States Attorney's Office for the Eastern District of New York (the "Office") and the Federal Bureau of Investigation ("FBI"). PSR at ¶¶ 1-9. During the course of that investigation, dozens of witnesses were interviewed and/or testified before a federal grand jury and the information provided by those witnesses was corroborated by numerous sources of evidence, including photographic evidence, physical evidence, and telephone records, including toll records and cell-site location data. That evidence, some of which is summarized below, overwhelmingly established that the defendant physically assaulted John Doe and then, along with other Suffolk County law

---

[1] While the defendant stipulated in the plea agreement, in connection with Count Two, that a two-point enhancement for "substantial interference with the administration of justice," pursuant to U.S.S.G. § 2J1.2(b)(2), was applicable, he now argues "it may not be a lawful enhancement." Def. Mem. at fn. 61. Contrary to this new assertion, which arguably violates the plea agreement, the government would prove at a Fatico hearing that the defendant's elaborate obstruction scheme was extensive in scope, planning and preparation, spanned a three-year period, and almost successfully derailed a federal investigation. The defendant's conduct in this obstruction conspiracy included, but was not limited to, threats both express and implied made directly and indirectly to witnesses, the recruiting of high-ranking officials from other county agencies to assist him in the obstruction and to give teeth to his threats, and, most egregiously, the actual suborning of perjury. In sum, the enhancement applies and the government will prove it if the defendant intends to proceed with this objection.

enforcement authorities, conspired to obstruct the federal investigation into that assault for a period of years.[2]

A. Assault of John Doe

On the morning of December 14, 2012, New York State Probation Department and SCPD officers arrested John Doe, who was on probation, at his mother's home in Smithtown, New York. During the arrest, officers discovered a cache of property stolen from numerous automobiles, among them an SCPD-issued SUV operated by the defendant, who, at that time, was the SCPD Chief of Department—the highest-ranking uniformed officer in the department. The items stolen from the defendant's vehicle included his gun belt, high-capacity magazines of ammunition, a box of cigars, humidor, and a canvas bag that contained, among other items, sex toys and pornography. John Doe was transported to the SCPD's Fourth Precinct for arrest processing.

In the first, and comparatively less egregious, abuse of his authority on December 14, 2012, the defendant entered John Doe's residence, an active crime scene, while the police search for evidence was still underway. The defendant retrieved his canvas bag and other personal articles in direct violation of SCPD procedure and protocol. In other words, the defendant tampered with and removed evidence from a crime scene because he was the "Chief," because he knew no one would stop him, and because some of the items taken from his SCPD vehicle would cause him significant embarrassment.

Later that day, the defendant exponentially increased his abuse of authority. After removing the physical evidence from the crime scene, the defendant drove to the Fourth Precinct, cleared the squad room, and entered the interrogation room where John Doe was being held. Despite the fact that John Doe was handcuffed, hunched over and shackled to the floor, the defendant assaulted John Doe. Specifically, the defendant violently shook John Doe's head, punched him in the head and body and attempted to knee and kick John Doe. Additionally, knowing that John Doe was a heroin addict, the defendant threatened to kill John Doe, stating he would make sure John Doe received a "hot shot." A "hotshot" is slang for either a fatally strong dose of heroin or one mixed with chemicals or poison intended to kill upon injection. Despite the fact that he was unable to defend himself, John Doe, referencing the pornography he found in the defendant's bag (which he believed depicted a minor on a printed cover) called the defendant a "pervert." The defendant then went out of control, screaming and cursing at John Doe and assaulting him until one of the detectives finally said, "Boss that's enough, that's enough."

---

[2] The factual summary contained herein is provided to supplement the PSR and assist the Court in sentencing the defendant. As such, the factual summary focuses on the conduct of the defendant and does not include a summary of all the details or breadth of the government's investigation, which is on-going with respect to other co-conspirators.

Later that day, the defendant congratulated the SCPD and Probation officers, who arrested John Doe and recovered his property (apparently unconcerned that he had jeopardized a larceny investigation that victimized many other civilians solely to retrieve embarrassing personal articles). The defendant even bragged to others within the SCPD about his assault of John Doe. For example, several days later, at an SCPD Christmas party held at Oheka Castle, the defendant regaled a group of detectives with his account of the assault, saying it reminded him of his "old days" as a young police officer, and referred to detectives who were present during the assault of a defenseless prisoner as his "palace guards."

B. Obstruction of Justice

Notwithstanding the fact that John Doe was a heroin-addict, who was charged with burglary related to the break-ins of numerous automobiles and criminal possession of a weapon offenses (in connection with the theft of the defendant's high-capacity magazines which were left in his car), beginning on December 14, 2012, the prosecution of John Doe was inexplicably handled by the Suffolk County District Attorney's Office's Government Corruption Bureau ("SCDAO-GCB"). An ADA from the SCDAO-GCB handled John Doe's initial arraignment and bail hearing, which were delayed for two days, the grand jury presentation, arraignment on the indictment, and the initial status conferences. It was not until March 2013, after John Doe alleged that the defendant and other members of the SCPD assaulted him while he was in custody, that the SCDAO-GCB transferred the case to a Queens County Assistant District Attorney, who was appointed to act as special prosecutor in John Doe's criminal case.

During approximately the same period of time, the Office and the FBI opened a civil rights investigation of the John Doe assault, which investigation became apparent on the morning of June 25, 2013, when the FBI served grand jury subpoenas on several SCPD members. From the moment the federal investigation began, the defendant and his co-conspirators took substantial steps to obstruct the investigation. The first order of business was to ensure that no SCPD members cooperated with the federal investigation. To that end, the members who had been served with subpoenas were immediately interrogated for the express purpose of determining what, if anything, each member said to the FBI, and conversely what the FBI agents said to them. The second order of business undertaken by the defendant and his co-conspirators was to arrange for hand-picked lawyers to represent the members. However, several SCPD members were warned that their attorney fees would not be paid by the union if they admitted to any wrongdoing.

Throughout 2013, as the federal investigation continued, and John Doe's allegations regarding the assault became public through the filing of a suppression motion, the SCPD members who witnessed the assault came under direct and extreme pressure from the defendant and others to conceal it. Shortly after the issuance of the federal grand jury subpoenas and the appointment of the special prosecutor for John Doe's case, the defendant

4

summoned the witnesses to his office at SCPD headquarters in Yaphank, New York, for the purpose of getting their "stories straight." The defendant told the witnesses that they should agree that he merely "popped" his head into the interrogation room to look at John Doe at the precinct, but that otherwise, nothing happened. Knowing the defendant's reputation for violating the law and seeking retribution against those who went against his corrupt orders, the witnesses feared their careers would be destroyed if they did not join the defendant's conspiracy to cover up the assault. Additionally, the defendant ordered another high-ranking member of the SCPD, who not only reported directly to the defendant, but was a close personal friend, to be the liaison with the special prosecutor. The defendant orchestrated this for the express purpose of monitoring the special prosecutor's investigation and prosecution, and to learn who was being interviewed and what was being said.

In October 2013, an evidentiary hearing on John Doe's motion to suppress evidence in his state case was held in Suffolk County Court in Riverhead, New York. One of the SCPD officers, who was present during the assault of John Doe, was subpoenaed to testify. Days before the hearing, the defendant confronted the witness and reiterated his expectation that the witness would falsely deny John Doe's allegations. With no recourse, and fearing retribution if he testified truthfully or even asserted his Fifth Amendment privilege against self-incrimination, the witness committed perjury at the defendant's direction at the hearing and falsely denied that John Doe had been assaulted.

In a further attempt to instill fear in the SCPD witnesses, and to deter them from cooperating with the federal investigation, a police union official admitted that he told several SCPD members that the defendant and other high-ranking Suffolk County law enforcement authorities had secretly obtained copies of FBI memoranda of interviews with witnesses in the federal investigation, and ominously suggested it would soon be known who was "talking" to federal law enforcement.[3] Naturally, witnesses were terrified upon hearing the claim. One SCPD witness told a federal agent that if the claim were true, "I'm a dead man." Still further, in 2014, SCPD officers assigned to a joint state-federal task force on Long Island were ordered by the defendant to report back to him in the event they observed certain witnesses meeting with federal agents or prosecutors at FBI offices or the United States Courthouse in Central Islip.

Initially, the efforts by the defendant and his co-conspirators to obstruct the federal investigation were successful and, as of May 2015, the investigation had not resulted in any criminal charges. Several witnesses informed the government that the defendant and his co-conspirators believed, incorrectly, that the federal investigation had been concluded. However, when the defendant and others learned in June 2015 that the federal investigation

---

[3] The union official subsequently claimed that the SCPD never actually obtained copies of the FBI reports. However, it's clear that the claim was made in order to intimidate members of the SCPD and deter them from cooperating.

5

was ongoing, efforts to obstruct the investigation were renewed with a vengeance. In short order, the defendant and other co-conspirators held a series of meetings to facilitate the obstruction and to attempt to exert pressure to intimidate members of the SCPD and other witnesses in order to deter them from telling the truth and cooperating with the investigation. Efforts by the defendant and co-conspirators to tamper with witnesses and impede the federal investigation continued until late 2015 when the defendant was arrested and ordered detained by the Court. For example, several witnesses have advised that as late as October 2015, the defendant handed, or attempted to hand witnesses a "timeline" of the John Doe matter containing a litany of false events and suggested talking points to argue that any continuing investigation of him was improper. Consistent with witness accounts of meetings with the defendant, the timeline includes the defendant's false claim that on December 14, 2012, he merely "popped" his head into the interrogation room where John Doe was in custody to see if he recognized the suspect. Finally, in conjunction with other high-ranking Suffolk County law enforcement officials, the defendant ordered a commanding officer within the SCPD to find out if any of the eye-witnesses to the assault were cooperating with federal authorities, and to remind them of the potential for retribution should they cooperate.

Despite the efforts by the defendant and his co-conspirators to obstruct the federal investigation, on December 8, 2015, the grand jury returned the above-referenced indictment and, the following day, the defendant was arrested by the FBI. The Court ordered the defendant detained pending trial and he has remained in custody since his arrest. Thereafter, on February 26, 2016, the defendant pled guilty to both counts of the indictment, deprivation of John Doe's civil rights and conspiracy to obstruct justice.

### IV. The Defendant Should Be Sentenced to the High-End of the Guidelines Range

For the reasons set forth below, the government respectfully submits that the Court should sentence the defendant to 51 months' incarceration.

#### A. Legal Standard

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a). Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but Booker allows the court to "tailor the sentence in light of other statutory concerns[.]" Kimbrough v. United States, 552 U.S. 85, 101 (2007) (citing Booker at 245-46 and Gall v. United States, 552 U.S. 38, 46-49 (2007)). However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a). Id. That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and
>
> (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

B.  Analysis

Here, pursuant to the recent decisions of the Supreme Court, the Court's "starting point and the initial benchmark" should be the advisory Guidelines range of 41 to 51 months. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)). As set forth below, the government respectfully submits that the Court should sentence the defendant to the high-end of that range.

1.  The Seriousness of the Offenses

As an initial matter, with respect to § 3553(a)(1), the defendant pled guilty to two extremely serious offenses, assaulting John Doe under color of law, a crime of violence, and conspiracy to obstruct a federal investigation. The seriousness of the defendant's conduct weighs heavily in favor of a sentence at the top of the Guidelines range. Assaulting an in-custody prisoner is a serious offense under any circumstances, but there are several aggravating factors present here that weigh in favor of a 51-month sentence.

First, the defendant's assault of John Doe did not occur in the context of an arrest or in the heat of the moment, but rather, it was premeditated and willful. Specifically, after improperly retrieving his personal property from an active crime scene, the defendant drove to the Fourth Precinct, entered the interrogation room, assaulted John Doe, threatened to give him a "hot shot," and, after John Doe called him a "pervert," the defendant escalated the assault. Second, during the assault, John Doe was shackled, presented no threat to the defendant or the other SCPD members, and was unable even to protect himself from the defendant's attack. Third, this offense is more serious in light of the fact that, at the time, the

7

defendant was the highest ranking, uniformed member of the SCPD and he abused that status to both retrieve his personal property from an active crime scene, and to get access to John Doe. Fourth, John Doe is a repeat offender, who victimized not only the defendant, but numerous other victims, and the defendant's conduct significantly jeopardized the prosecution of John Doe for the burglaries. Finally, the defendant's actions have severely undermined the public's trust in law enforcement at a time in which relations between law enforcement and the public are at an all-time low.

Most telling of all is that, rather than accepting responsibility for the assault of John Doe, the defendant and his co-conspirators engaged in an extensive and elaborate conspiracy to cover-up the assault, including obstructing both the federal investigation and the Suffolk County prosecution of John Doe for the burglaries. In doing so, the defendant corrupted the SCPD, used his position within the police department to subvert the criminal justice system and significantly undermined the public's trust in all of law enforcement. As set forth above, the defendant and his co-conspirators attempted to cover-up the incident by, among other things, pressuring SCPD subordinates to lie and conceal the assault and using Suffolk County law enforcement authorities to intimidate SCPD members and other witnesses. The defendant's actual power in Suffolk County made numerous witnesses fearful that directly or indirectly, through his allies, their careers would be destroyed or worse. That a veteran law enforcement officer--since forced out of the department--would declare, "I'm a dead man," upon being told that the defendant had obtained access to federal investigative materials, is testament to the climate of fear that existed under the defendant's reign of power, which some liken to a reign of terror.

Finally, witnesses informed the government that, even in late 2015, when the defendant suspected he would be indicted, he continued to try to intimidate witnesses and threatened to "take everyone" down with him. Alternatively, he pleaded with others to remain "strong," not cooperate with federal authorities, and he provided witnesses with his false "timeline" of events. During these conversations, the defendant also alluded to private matters affecting the personal lives of SCPD personnel and their families in a clear effort to blackmail them into submission.

In sum, the defendant committed a serious act of violence against John Doe, under color of law, and then attempted to conceal the assault through the use of his and others' high-ranking law enforcement positions in Suffolk County, through threats, intimidation and, subornation of perjury. In terms of obstructing justice, it is hard to imagine a more serious example of this conduct than the highest-ranking uniform member of the police department assaulting a suspect and then orchestrating a cover up of his actions for three years during which he suborned perjury and prevented witnesses from telling the truth. This conduct cannot and will not be tolerated in a democratic society. The seriousness of the offenses demands a term of imprisonment at the high end of the Guidelines range.

2. The History and Characteristic of the Defendant

Similarly, the defendant's history and characteristics warrant a sentence at the high-end of his advisory Guidelines range. In support of his request for a sentence of time served, the defendant relies on three principal factors: (a) his self-described "extraordinary career history," (b) his claimed "unique family circumstances" and (c) his purported "genuine acceptance of responsibility." Def. Mem. at 1.

a. Unique Family Circumstances

The defendant argues that his "unique family circumstances," more specifically, the illness of his mother and his prior role as her primary caregiver, warrant a time-served sentence. While of course the defendant's mother's health situation is difficult and unfortunate, this factor in no way warrants the dramatic sentencing departure requested by the defendant, and in fact, in this case, does not warrant a departure at all.

First, even if the defendant was his mother's primary care-giver prior to his arrest, as demonstrated by the sentencing letters submitted on his behalf, the defendant has a number of other family members in the area who are able to care for his mother during his incarceration. Specifically, the defendant has two brothers who are able to care for their mother, and are doing so presently. In fact, the defendant's brother, John Toal, currently lives with their mother, and has taken over the defendant's role as her primary caregiver. See PSR at ¶ 36. Moreover, the defendant's other brother, Michael Burke, lives close to their mother, and there is nothing alleged that would prevent him from assisting her as well. Id. Ironically, most defendants do not have nearly the family support the defendant is fortunate to have, nor do they have the luxury of siblings able to care for their aging parents and family while incarcerated.

Second, the defendant's mother has been suffering with the same health problems for many years, including during the period of time when the defendant committed the instant offenses. In all criminal cases, family members of incarcerated people suffer. It is an unintended and sad consequence of incarceration. It is also one of the risks a defendant assumes when he commits a crime. Simply stated, the defendant's own conduct is what is preventing him from taking care of his mother, fortunately he has family members who are able to step in and take care of her in his absence.

In sum, the defendant's concern for his mother's health did not prevent him from committing the crimes that caused him to be incarcerated, and, that fact, coupled with the fact that others are availability to take care of his mother, militates against any reduction based upon unique family circumstances. In short, there is nothing unique about the defendant's family circumstances.

9

b. <u>Extraordinary Career History</u>

The defendant asks the Court to consider his "long and extraordinary" career in law enforcement and alleges that this is the first time he has violated the public trust. Def. Mem. at 1 and 5-17 and 25. However, the defendant's career and purported good works must be weighed against his criminal conduct, which was far from aberrational.

Contrary to the defendant's assertions, this is not the first time he violated the public trust and abused his authority as a member of the SCPD. Moreover, the assault of John Doe and ensuing cover-up was not, as claimed, aberrant behavior or the result of a momentary lapse of judgment—the obstruction conspiracy continued for almost three years—and was not an anomaly.

During his career with the SCPD, the defendant was the subject of a number of internal affairs investigations, including a substantiated case in which he was found to have consorted with a convicted felon and failed to secure his service weapon on two occasions, resulting in the loss of those weapons. Additionally, the defendant repeatedly abused his authority by having SCPD subordinates transport him and others to and from airports, conduct surveillance on his girlfriends and/or his girlfriends' ex-significant others', and visit a girlfriend's house when there was an issue with a handy-man.

Further, the obstruction of the federal investigation in this matter is merely one event in what witnesses have described as a long-standing series of events orchestrated by the defendant with the intent to create a climate of fear to protect his interests. For instance, in 2011, the defendant, by his own admission to others, was driving under the influence of alcohol[4] and struck a state-owned vehicle driven by a "friend." Abusing his power and authority, the defendant and the other driver, who was also under the influence of alcohol, left the scene of the accident and avoiding any consequence for driving while intoxicated. The defendant and his friend then concealed the extensive damage to the state vehicle by using a private auto body repair shop to repair the vehicle, repairs which the defendant paid out of pocket to cover-up his crimes.

Moreover, in 2013, the defendant used an outside contractor to perform the illegal installation of a GPS device on a high-ranking civilian police department official. The

---

[4] Many witnesses interviewed during the course of the investigation described the defendant as a daily and heavy consumer of alcohol, specifically, vodka and scotch. In fact, during his tenure as Chief of Department, witnesses advise that a closet in the defendant's office was repurposed into a make-shift bar which was open every night for "drinks." Moreover, the same witnesses advise that the defendant regularly drove under in the influence of alcohol, emboldened by his position of authority. This information is wholly inconsistent with the defendant's statements in the PSR that he never "abused alcohol," and that he only consumed "a glass of wine two to three times per week with dinner." PSR at ¶ 47.

purpose of the GPS was to conduct surveillance of the official, whom the defendant disliked, in an attempt to gain information that would enable him to blackmail or force that official out of office.

Finally, the defendant regularly discussed his desire to seek retribution against a list of current and former SCPD personnel who he viewed as disloyal, and recruited and ordered others to assist him in these endeavors. For example, in July 2015, when one of the defendant's perceived enemies was set to retire, the defendant sent union officials and others to the officer's retirement party for the express purpose of spying on the attendees in order to catalogue who was in attendance. The understanding was that those disloyal attendees would suffer consequences for consorting with his (the defendant's) enemy. There is a legitimate concern that the defendant will, once released, seek retribution against those whom he perceives have done him wrong.

In sum, characterizing the events (the assault and cover-up) as aberrational or a momentary lapse in judgment is a gross and outrageous understatement. In determining the appropriate sentence, the Court must balance the defendant's "good acts" against the criminal acts to which he has pleaded guilty, while taking into consideration the defendant's other brazen acts and the climate of fear he fostered in the SCPD. The government suggests that on balance, a sentence of 51 months is required.

3. The 3553(a)(2) Factors

The Court must also consider the factors set forth in § 3553(a)(2)(A)-(C), which provide that a sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). These factors also weigh heavily in favor of a 51-month sentence.

a. Respect for the Law

First, with respect to factor § 3553(a)(2)(A), for the reasons set forth above, the defendant's assault of John Doe was a crime of violence and an extremely serious offense that must be adjudicated in a manner that will promote respect for the law and provide just punishment for the offense. Despite the fact that he was a law enforcement officer himself, the defendant demonstrated utter disregard for the law and the justice system— at both the local and federal levels. The defendant compromised the burglary case against John Doe from the start by removing evidence from the crime scene and abusing the suspect. Thereafter, he pressured subordinates to cover-up the assault, including forcing one SCPD member to commit perjury at the suppression hearing and threatening and intimidating SCPD members in order to conceal pertinent information from the federal investigation. Thus, a 51-month sentence for the defendant is necessary to "promote respect for the law."

11

b.  General Deterrence

Second, sentencing factor § 3553(a)(2)(B) requires that the Court's sentence to afford adequate deterrence to criminal conduct, which is a particularly significant consideration in this case. Law enforcement officers, especially those such as the defendant, who occupy leadership positions, are entrusted with significant power and responsibility. They are permitted, consistent with the rule of law, to imprison people who violate the law and they are authorized to carry firearms and employ force, including deadly force, when necessary. However, society relies on law enforcement officers to refrain from abusing that authority and to exercise those powers and responsibilities sparingly and consistent with the Constitution. A vast majority of law enforcement officers exercise tremendous bravery and integrity to protect our communities. However, the defendant not only failed to uphold those values, he abused his high-ranking position for his own interests. Moreover, the defendant's conduct stained the reputation of the SCPD and its members, a vast majority of whom are hardworking and dedicated law enforcement officers. A sentence at the high-end of the Guidelines range would send a strong message of deterrence that the violent and obstructive conduct engaged in by the defendant and other Suffolk County officials will not be tolerated and will be met with meaningful punishment.

c.  Specific Deterrence

Third, pursuant to § 3553(a)(2)(C), there is also a need for specific deterrence and it is essential for the Court's sentence to "protect the public from further crimes of the defendant." As set forth above, the conspiracy to obstruct the investigation into the assault of John Doe began on December 14, 2012, the day the defendant assaulted John Doe, and continued for almost three-years until the defendant was arrested. The defendant's participation in such an extensive plot to obstruct the federal investigation demonstrates not only his arrogance and his misguided view that he was above the law, but it also demonstrates a considerable lack of remorse. Still further, while he was the Chief of the SCPD, the defendant created a climate of fear in Suffolk County, particularly among his subordinates in the SCPD. Despite the fact that the defendant retired from the SCPD, he maintains extremely close relationships with numerous high-ranking Suffolk County law enforcement authorities and many witnesses continue to fear retribution for their cooperation with the federal investigation. Notably, many of the sentencing letters submitted on the defendant's behalf are from current or retired law enforcement officers, including a letter from a current Senior Detective Investigator—Pete Tartaglia from the Suffolk County District Attorney's Office, which perpetuates the climate and fear of retribution. Thus, this factor heightens the need for the Court's sentence to protect the public from further crimes of the defendant and weighs in favor of a sentence at the high-end of the Guidelines range.

d.   Sentencing Disparity

Finally, the defendant argues that other similarly situated defendants have received shorter terms of imprisonment, thus, a non-incarceration sentence of time served plus probation is appropriate. Def. Mem. at 28-31. The argument is unpersuasive, naïve and fails to properly address the defendants rank in the SCPD.

First, a review of all the cases cited by the defendant reveals that not one of the law enforcement officers charged in those alleged similar matters was a Chief. In fact, in all but one case, the defendant was either a uniform police officer or corrections officer (one of the corrections officers was a Lieutenant). This is a critically important distinction as one of the most egregious aspects of the instant case is the defendant's abuse of his rank, and ability to command subordinates to cover-up his crimes. Moreover, not one of the cases cited by the defense involved a three-year long conspiracy to obstruct a federal investigation. In sum, the defendant's sentencing disparity argument fails as it is based upon a flawed view of the facts of the other matters, and, the claim that the defendant's case "falls on the low end of severity" in contrast to the other matters is ludicrous.

## V.   Conclusion

The Court succinctly and powerfully assessed the seriousness of this case and the dangers posed by the defendant, stating that:

> I find the corruption of an entire department by this defendant shocking. A man who has taken every oath[], who made pledges and has a responsibility, has violated every one of them. Based on his past performance, there is no set of circumstances concerning bail that I can honestly trust him to fulfill and there is no way he can be supervised to the degree where he's not a danger to the community. [] The danger to the community in regard to his actions, he still has, the evidence is clear, [he] has the power."

Transcript, December 11, 2015 at 40-41.

The same factors and considerations that the Court identified, when finding that the defendant was a danger to the community and should be detained pending trial also support a sentence at the high-end of the Guidelines range. Accordingly, the government respectfully submits that the Court should sentence the defendant to 51 months in prison.

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By: _____
John J. Durham
Lara Treinis Gatz
Assistant U.S. Attorneys
(631) 715-7851/7913

cc: John Meringolo, Esq. (By ECF and email)
USPO Steven Guttman (By email)